# UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| THE LANDS COUNCIL,<br><br>    Plaintiff,<br><br>vs.<br><br>JANE COTTRELL, Acting Regional Forester of Region One of the U.S. Forest Service; RANOTTA MCNAIR, Supervisor of the Idaho Panhandle National Forest; and UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture;<br><br>    Defendants. | Case No.:  CV 09-164-N-EJL-REB<br><br>**REPORT AND RECOMMENDATION** |

Currently pending before the Court are Plaintiff's Motion for Summary Judgment (Docket No. 24) and Defendants' Motion for Summary Judgment (Docket No. 27).[1]  Having carefully reviewed the record, considered oral arguments, and otherwise being fully advised, the Court enters the following Report and Recommendation:

## I.  SUMMARY OF RECOMMENDATION

The undersigned finds that Defendants violated the National Forest Management Act ("NFMA"), 16 U.S.C. § 1601, *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*, in authorizing the Bussel 484 Project by failing to ensure the viability of old growth forest dependent, sensitive, and management indicator species.  Accordingly, the

---

[1]  Also pending is Plaintiff's Motion for Preliminary Injunction (Docket No. 47). However, resolving the cross-motions for summary judgment effectively renders this motion moot.

**REPORT AND RECOMMENDATION - 1**

undersigned recommends that the district judge: (1) set aside the decision authorizing the Bussel 484 Project and remand to the agency and (2) enjoin any logging authorized under the Project unless and until the agency has conducted an analysis of species viability in the Project Area that satisfies NFMA and NEPA standards.

## II.  BACKGROUND AND PROCEDURAL HISTORY

This is a civil action seeking review of a decision by the Unites States Forest Service approving the Bussel 484 Project ("Project") in the St. Joe Ranger District of the Idaho Panhandle National Forest ("IPNF").  *Second Amended Complaint*, ¶ 2 (Docket No. 17).

### A.      The Parties

Plaintiff, the Lands Council, is a nonprofit corporation dedicated to the long-term community and biological stability of the Greater Columbia River Ecosystem.  *Id.* at ¶ 15. Plaintiff's members and staff use and enjoy the IPNF, including the area in which the Project will take place.  *Id.* at ¶ 10.  Defendants include: (1) Jane Cottrell, Acting Regional Forester for the Northern Region of the Forest Service; (2) Ranotta K. McNair, the Forest Supervisor for the IPNF; and (3) the USFS, an administrative agency within the Department of Agriculture (collectively referred to hereinafter as "Forest Service") entrusted with management of the national forests.

### B.      The Project Area

The Bussel 484 Project Area is located within the Bussel Creek Watershed, a tributary of Marble Creek, and is located eight miles northeast of Clarkia, Idaho, Shoshone County in the IPNF.  (AR 3:1).  The Project Area covers 14,646 acres, 83% of which is Forest Service land. *Id.*  The remaining 2,454 acres are privately owned.  *Id.*

**REPORT AND RECOMMENDATION - 2**

The Project Area is composed of subalpine fir, spruce, western red cedar, western

hemlock, and grand fir forests located entirely within the IPNF's Old Growth Management Unit

("OGMU") Eight.  *See Second Amended Complaint*, ¶ 29 (Docket No. 17); (AR 2:163).  Both

parties agree that the quality of old growth habitat in the Project Area has degraded over time

due to fire and past logging activity.  (AR 2:147-48); *See First Amended Complaint*, ¶¶ 29-34

(Docket No. 17).[2]

## C.    Project Development

From the outset, beginning in August 2003, the Forest Service involved interest groups,

individuals, tribes, and agencies in the development of the Project.  (AR 3:30, 2:7).[3]  Early on in

the process, the purpose and need for the Project were identified as follows: (1) maintain or

improve resilience of the vegetative resources to disturbances such as insects, disease, and fire;

(2) provide wood products for local communities; (3) work toward full support of designated

beneficial uses in the Bussel Creek Watershed; and (4) manage access to provide for multiple

uses.  (AR 2:4-5, AR 3:1-2).

In April 2005, the Forest Service issued a scoping notice and also published in the

Federal Register a notice of intent to prepare an environmental impact statement.  (AR 3:30, AR

2:7).  After several years of work, study, and collaboration, a draft environmental impact

statement ("DEIS"), was made available for public comment on the IPNF website on February

---

[2]  Plaintiff contends that the habitat has also been degraded due to fire suppression
activity, but the Forest Service contests that allegation.  *Defendants' Opposition to Plaintiff's
Summary Judgment*, p. 7, n. 5 (Docket No. 35).

[3]  *See generally* AR 4-73 (project development) and AR 74- 180 (public involvement).

**REPORT AND RECOMMENDATION - 3**

21, 2008.  (AR 3:30, AR 144).  A related Notice of Availability appeared in the Federal Register on March 7, 2008.  (AR 3:30, AR 156).

The DEIS identifies three possible alternative actions in the Project Area: Alternative A: no action, Alternative B: proposed logging and related road construction activities, and Alternative C: logging with no road construction.  (AR 1:3).  In May 2008, the Forest Service issued a final environmental impact statement ("FEIS") (AR:2) and a Record of Decision ("ROD") (AR:3) approving Modified Alternative B, the commercial logging and road construction project -- the Bussel 484 Project.

Modified Alternative B involves the harvest of approximately 2,137 acres using a variety of silvicultural prescriptions (1,486 acres of commercial thin, 521 acres of group shelterwood, 53 acres of seedtree, and 78 acres of clearcut with reserves).  (AR 3:5).  The ROD indicates that Alternative B was selected, in part, because "it best meets the need to improve vegetative conditions through reducing stand density, changing species composition, and promoting larger trees in the future."  (AR 3:27).  By reducing stand density, the Forest Service intends to "decrease the competition for water, nutrients, and sunlight in stands and promote increased growth and yield."  (AR 3:27).  The goal is to remove the smaller trees and focus growth on the larger diameter, more vigorous trees.  (AR 3:28).

To facilitate the harvest activities, Modified Alternative B also involves road construction.  The road activity authorized by the Project includes: (1) constructing 4.5 miles of system road and .5 miles of temporary road; (2) improving or reconstructing 5.4 miles of existing

**REPORT AND RECOMMENDATION - 4**

road; and (3) removing 10.7 miles of existing roads and placing 20.2 miles of existing roads into "long term storage." [4] (AR 3:4).

The ROD provides that the Project will not harvest any timber or construct any roads within old growth stands.  (AR 3:14, 45).  However, it is undisputed that the Project will have an effect on the habitat of old growth dependent species.  The FEIS states that the Project will eliminate the following habitat: (1) one of eight home ranges modeled for the pileated woodpecker (AR 2:272); (2) three of 19 nesting stands modeled for the goshawk (AR 2:275); (3) 100 acres of habitat modeled for the threatened Canada lynx (AR 2:279); (4) and 256 acres of habitat modeled for the fisher and marten (AR 2:288).  Nevertheless, evaluating the over-all impact of the Project on wildlife habitat, the Forest Service determined that the Project would not contribute towards federal listing or loss of viability for any of the wildlife species in the Project Area.  (AR 2:292).[5]

With regard to cumulative impacts, both the DEIS and FEIS identify "fire and fuels" as having an environmental effect on the Project Area.  (AR 1:82-88), (AR 2:129-42).  The DEIS analyzes the effect of fire under the general direction of Forest Plan.  (AR 1:82).  The FEIS analyzes the effect of fire under the now-withdrawn forest-wide, 2008 IPNF Fire Management Plan ("2008 Fire Plan").  (AR 129).   Consistent with the 2008 Fire Plan, the logging aspect of

---

[4]  The roads are put into "long term storage" by removing culverts and erecting barriers with no foreseeable plans to put the roads back into use for 15-20 years.  (AR 3:9).

[5]  The FEIS considered the Project's impact on the following species: pileated woodpecker (AR 2:269-72), northern goshawk (AR 272-76), elk (AR 2:276-78), Canada lynx (AR 2:279-83), gray wolf (AR 2:284-86), fisher and marten (AR 2:286-88), wolverine (AR 2:288-89), black-backed woodpecker (AR 2:289-90), Coeur d'Alene salamander (AR 290-91), and western toad (AR 2:291-92).

**REPORT AND RECOMMENDATION - 5**

the Project is intended to mimic the effects of fires of low to moderate intensity.  (AR 2:141-42,

AR 3:39-40).  However, fire itself will be suppressed throughout the Project Area.  (AR 2:61)

("Consistent with current policy, efforts will be made to suppress all fires which occur in the

project area.").

**D.     Procedural History**

Plaintiff filed an administrative appeal of the decision approving Modified Alternative B,

and the Forest Service denied the appeal on July 31, 2008, constituting the final administrative

action in this matter.  On April 9, 2009, Plaintiff filed the instant action arguing that the Project

violates NFMA, NEPA, and the Administrative Procedures Act ("APA").  Plaintiff seeks

injunctive and declaratory relief arguing that the Project, if implemented, will eliminate habitat

for old growth dependent, sensitive, threatened, and management indicator species, including the

pileated woodpecker, goshawk, Canada lynx, fisher, and marten.  *Plaintiff's Memorandum in*

*Support of Motion for Summary Judgment*, p. 2 (Docket No. 25).

Plaintiff also asserts claims related to a proposed action, the 2008 Fire Plan.  On March

18, 2008, the Forest Service implemented a Fire Plan for the IPNF.  (AR 1037).  At one time,

Plaintiff claimed that approval of the 2008 Fire Plan violated NEPA and the Endangered Species

Act.  *First Amended Complaint* (Docket No 11).  However, when the Forest Service later

withdrew the 2008 Fire Plan, Plaintiff withdrew these claims.  *See* Docket No. 16.  Nonetheless,

Plaintiff continues to contend that the Project EIS is flawed, in part, because the analysis of the

cumulative environmental impacts of fire and fire management is based on the implementation

of the now-withdrawn 2008 Fire Plan.  *Second Amended Complaint* (Docket No. 17).

**REPORT AND RECOMMENDATION - 6**

E.      **Status of Project Implementation**

Two timber sales authorized as part of the Project, the Bussel Peak and Tole Booth sales, have been awarded.  Plaintiff represents that logging activity in the Project area may begin as soon as August 1, 2010.  *See Second Declaration of Jeff Juel*, ¶ 8 (Docket No. 47-1).

## III.  STANDARD OF REVIEW

The APA provides the authority for judicial review of agency decisions under NFMA and NEPA.  *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).  The APA states, in relevant part, that a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be -- arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The arbitrary and capricious standard is deferential and an agency action will be reversed as arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009) (quotations and citations omitted).

Nevertheless, the Court must review the administrative action to ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  In reviewing that explanation, the court must "consider whether the decision was based on a consideration of the relevant factors and whether

**REPORT AND RECOMMENDATION - 7**

there has been a clear error of judgment." *Id.* (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 285 (1975); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).

## IV.  DISCUSSION AND HOLDINGS

Plaintiff claims that the Forest Service violated NFMA by failing to ensure viability of old growth dependent, sensitive, and management indicator species ("MIS") in the Project Area. Because no such species have recently been seen in the Project Area, Plaintiff alleges that the Forest Plan's old growth standards are either invalid or not being met.  Plaintiff's NEPA claims include allegations that the Forest Service: (1) failed to ensure the scientific integrity of the Forest Plan old growth standard; (2) failed to assess the cumulative impacts of the IPNF fire management policy; (3) improperly tiered the Project EIS to the now-withdrawn Fire Plan; and (4) failed to prepare a supplemental EIS when the Fire Plan was withdrawn.

In addition to opposing Plaintiff's substantive claims, the Forest Service also contends that Plaintiff's claims should be dismissed because they are not ripe, are not properly pleaded, and are barred under the doctrine of collateral estoppel.

## A.    **Plaintiff's Claims are Properly Before the Court**

The Court has jurisdiction to consider Plaintiff's claims, all of which are ripe, properly pleaded, and not otherwise barred under the doctrine of collateral estoppel.

### 1.    **Ripeness**

Claims regarding a Forest Plan are not ripe for challenge without site-specific action. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732 (1998).  Before then, the alleged harm is speculative.  *Id.*  Once a site-specific action takes place, the Forest Plan is subject to challenge

**REPORT AND RECOMMENDATION - 8**

but only if the Forest Plan "plays a causal role" with respect to the challenged action.  *Id.*

Further, only those aspects of the Forest Plan that are related to the challenged action are

properly subject to the suit.  *Id.*

The Forest Service contends that Plaintiff's allegations concerning the Forest Plan's old

growth standards are not ripe, because the Project will not harvest any old growth.  In making

this argument, Plaintiff relies upon the following language from *Lands Council v. Powell*, 395

F.3d 1019 (2005) ("*Lands Council I*"):

> [B]ecause no old growth forest is to be harvested under the
> selected alternative, we reject the contention that the Project will
> be impermissible if, thereafter, the 'allocated old growth' within
> the Forest is less than the Forest Plan requirement. If that
> requirement would not be met after this Project, then it must be
> that the requirement is not met now, for the proposed timber
> harvest cuts no old growth. If we were to accept the Lands
> Council's argument on this score, it would prevent any project
> from taking place. We do not think this is a sensible reading of the
> NFMA. Because no old growth forest is to be harvested under the
> Project, we hold that it cannot be said that the Project itself
> violates the IPNF Plan's requirement to maintain ten percent of the
> forest acreage as old growth forest.

*Id.* at 1036.

However, while Plaintiff in *Lands Council I* was not permitted to challenge whether the

site-specific action would impact the ten-percent old growth rule, Plaintiff was permitted to

challenge the old growth forest analysis as it relates to the population and viability of species

that require old growth habitat.  *Id.* (determining that Forest Service violated NFMA by failing to

monitor population trends).

Here, Plaintiff does not challenge the Project on the basis that it will preclude the Forest

Service from meeting old growth standards.  Instead, Plaintiff challenges the Project on the basis

**REPORT AND RECOMMENDATION - 9**

that the Forest Service failed to adequately address the Project's effect on the MIS and other old growth dependent and sensitive species in the Project Area. The old growth standards are at issue because the Forest Service relied upon the old growth standards as a proxy to ensure that it is meeting its species viability and monitoring requirements. Moreover, regardless of whether the Project will actually harvest old growth, it is undisputed that the Project will eliminate some habitat for the old growth dependent species in the Project Area. In short, Plaintiff's claims are ripe because the old growth standards at issue are being challenged in the context of a species viability claim that does not depend on the harvesting of old growth.

### 2.      Sufficiency of Pleading

The Forest Service argues that the Court should not entertain arguments regarding the validity of the Forest Plan in the context of a challenge to a site-specific Project if the Forest Plan is not the subject of any claim in the Complaint. *Defendants' Opposition to Plaintiff's Motion for Summary Judgment*, p. 2 (Docket No. 35).

The Court finds that Plaintiff's NFMA claim sets forth a direct and appropriate challenge to the Forest Plan old growth standards. In the Second Amended Complaint, Plaintiff alleges that the habitat in the Project Area has degraded significantly over time and that the Forest Service's analyses of old growth and species viability are flawed. *Second Amended Complaint*, ¶¶ 39-43, ¶¶ 55-81, ¶¶ 97-100, and ¶¶ 123-43. (Docket No. 17). In addition, Plaintiff alleges that there are "responsible opposing scientific viewpoints" challenging the old growth standards. *Id.* at ¶¶ 137-43. The old growth standards and species viability requirements stem from the Forest Plan.

**REPORT AND RECOMMENDATION - 10**

In addition, in the Second Claim for Relief, the NFMA violation claim, Plaintiff further states "[t]he inadequacy of the Forest's old growth standard is illustrated by the lack of old growth dependent and management indicator species found in the Project area" and "without a valid and implemented old growth standard, the Forest Service also violates the Forest Plan's more general mandate to ensure the viability of old growth dependent and management indicator species on the Forest." *Id.* at ¶¶ 116, 166 (Docket No. 17).  Moreover, an NFMA violation occurs either when the site-specific action is inconsistent with the Forest Plan's standards or the Forest Plan's standards are invalid, *see Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 966 (9th Cir. 2002).

Based on the allegations and the NFMA claim in the *Second Amended Complaint*, the Court is satisfied that Plaintiff's pleading is sufficient.  It is clear that Plaintiff is challenging the old growth standards on the basis that they are an inadequate tool to gauge species viability.

### 3.    Collateral Estoppel

The Forest Service argues that Plaintiff is collaterally estopped from bringing the Forest Plan claims because this federal district court has already determined that the IPNF old growth standards are valid, the Forest Inventory and Analysis ("FIA") database and the Timber Stand Management Record system ("TMRS") are reliable, and the habitat-as-proxy approach meets the Forest Service's requirements for maintaining species viability and monitoring MIS population trends.  *Defendants' Opposition to Plaintiff's Summary Judgment*, p. 5 (Docket No. 35).  "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, the decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."  *Dodd v. Hood River County*, 59 F.3d 852, 863 (9th Cir. 1995).

**REPORT AND RECOMMENDATION - 11**

"[C]ollateral estoppel applies only where . . . : (1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding." *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000).

In the previous lawsuit, Plaintiff challenged the Mission Brush Project on the IPNF on the basis that the Forest Plan's old growth standards were not being met and the proxy on proxy approach to species viability is unreliable and insufficient to satisfy NFMA's requirements. *Lands Council v. McNair*, 2009 WL 3199641 (D. Idaho Sept. 30, 2009) ("Mission Brush"). More specifically, with regard to the Forest Plan's old growth standards, Plaintiff challenged the Forest Service's finding that the IPNF, as a whole, met Standard 10(b), requiring ten percent old growth throughout the IPNF forested land. *Id.* at * 5. Judge Lodge upheld the agency's finding because it was based on two separate, independent and reliable tools to monitor old growth in the IPNF: the FIA and TMRS databases. *Id.* at *6-7. Judge Lodge also determined that the "the use of habitat as a proxy in the Mission Brush case was *not* arbitrary and capricious," because both: (1) the underlying methodologies for determining the quantity and quality of habitat necessary to sustain the viability of native species and (2) the methodology used for measuring habitat were reasonably reliable. *Id.* at *13-14.

While these same issues are raised herein with regard to the Bussel 484 Project, collateral estoppel does not apply, fundamentally because the cases concern two different, site-specific projects. *See Idaho Sporting Congress v. Rittenhouse*, 305 F.3d at 965 (holding res judicata did not apply where challenges concerned different timber sales). First, the old growth standards are

**REPORT AND RECOMMENDATION - 12**

potentially subject to the challenge of more recent research, as well as site-specific information concerning the well-being of the species in the project area.[6]  Second, the percentage of old growth is not an immutable constant but changes over time, as does the information in the FIA and TMRS databases, which is updated to reflect site-specific surveys.  Third, the validity of the habitat-as-proxy approach, which depends on the reliability of the old growth standards and the methodology for measuring old growth standards, must be determined on a case-by-case and site-specific basis.  Accordingly, collateral estoppel does not bar Plaintiff from bringing any of the claims alleged in the instant lawsuit.[7]

**B.      Plaintiff's NFMA Challenges**

Plaintiff argues that the Forest Service violated NFMA by failing to consider the Project's impact on species viability as required under the IPNF Forest Plan.  The Forest Service responds that it met its statutory obligations to ensure species viability and monitor the MIS by relying upon the Forest Plan's old growth standards.

**1.      Legal Framework**

NFMA's legal framework consists of three central components: (1) the statute; (2) the Forest Service implementing regulations; and (3) the Forest Plans implementing the regulatory and statutory directives that govern site-specific actions at the forest level.

---

[6]  The old growth standards, which are based on the habitat requirements of the MIS, may ensure species viability in one area but not in another due to a variety of factors.

[7]  Nonetheless, the decision contains persuasive authority, as it was issued by the presiding judge within the last year and provides a very recent analysis of the methodologies and databases used to inventory and monitor old growth in the IPNF.

**REPORT AND RECOMMENDATION - 13**

a.      **General Statutory Framework**

The Forest Service manages the national forests under "a number of interconnected

congressional directives."  *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1511 (9th Cir.

1992).  The general administrative philosophy of the Forest Service is expressed in the Multiple-

Use Sustained Yield Act ("MUSYA") of 1960, 16 U.S.C.A. §§ 528-531, which requires a

careful balancing of often competing resources, including "outdoor recreation, range, timber

watershed, and wildlife and fish purposes." 16 U.S.C. § 528.

NFMA incorporates this multiple use philosophy, adding "wilderness" as an additional

management philosophy within the multiple use framework.[8]  16 U.S.C. § 1604(e).  In addition,

NFMA provides a two-step process for forest planning and management.  *Native Ecosystems*

*Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1249 (2005).

The first step of the NFMA process is the development of a Land Resource Management

Plan ("Forest Plan") for each unit of the National Forest System.  16 U.S.C. § 1604(f)(1).

NFMA contains substantive and procedural requirements for these Forest Plans, including a

directive that they be "revised . . . from time to time when the Secretary finds conditions of a unit

have significantly changed, but at least every fifteen years."  16 U.S.C. § 1604(f)(5).

The second step of the NFMA process requires that all "individual management actions

within a forest unit, all relevant plans, contracts, or permits must be consistent with each forest's

---

[8]  This reference to "wilderness" reflects the passage and applicability of the Wilderness
Act, "aimed at protecting areas 'where the earth and its community of life are untrammeled by
man, where man himself is a visitor who does not remain.'"  *See Idaho Conservation League v.*
*Mumma*, 956 F.2d at 1511 (quoting 16 U.S.C. § 1311(c)).

**REPORT AND RECOMMENDATION - 14**

overall management plan." *Native Ecosystems Council*, 428 F.3d at 1249 (citing 16 U.S.C.

§ 1604(i)).  A site-specific decision inconsistent with the Forest Plan violates NFMA.  *Id.*

      **b.**      **Regulations Governing Forest Plans**

     NFMA directs the Forest Service to promulgate regulations consistent with the MUSYA

"that set out the process for the development and revision of the [Forest Plans.]"  16 U.S.C.

§ 1604.  The regulations must ensure that Forest Plans, among other things, "provide for

diversity of plant and animal communities based on the suitability and capability of the specific

land area in order to meet overall multiple-use objectives. . . ."  16 U.S.C. § 1604(g)(3)(B).

     The IPNF Forest Plan, issued in 1987, was developed under Forest Plan regulations

promulgated in 1982.  The 1982 rules require that Forest Plans provide the habitat necessary to

support viable populations of existing native and desired non-native vertebrate species:

> Fish and wildlife habitat shall be managed to maintain viable
> populations of existing native and desired non-native vertebrate
> species in the planning area.  For planning purposes, a viable
> population shall be regarded as one which has the estimated
> numbers and distribution of reproductive individuals to insure its
> continued existence is well distributed in the planning area.  In
> order to insure that viable populations will be maintained, habitat
> must be provided to support, at least, a minimum number of
> reproductive individuals and that habitat must be well distributed
> so that those individuals can interact with others in the planning
> area.

36 C.F.R. § 219.19 (1982).  This species viability requirement applies to all "existing native and

desired non-native vertebrate species in the planning area."  *Id.*

     The 1982 rules also define "management indicator species" that must be selected by the

Forest Service, as to which "population changes are believed to indicate the effects of

management activities."  *Id.*(1).  The Forest Service must monitor the population trends of these

**REPORT AND RECOMMENDATION - 15**

species and evaluate management alternatives "in terms of both amount and quality of habitat and of animal population trends of the management indicator species." *Id.* (2), (6) (1982).

In the instant case, the 1982 regulations apply *only* to the extent that they were incorporated into the IPNF Forest Plan. The 1982 regulations were superceded in 2000 and do not provide an independent source of legal authority governing the Forest Service's decision to authorize the Project.[9]

### c. Forest Plan Standards

Consistent with the 1982 NFMA regulations, the IPNF Forest Plan identifies certain species as management indicator species and establishes a process for monitoring these species. Also generally consistent with NFMA, the Forest Plan contains objectives for species diversity and viability in the IPNF and permits the Forest Service to rely upon its compliance with old growth standards to meet the species viability requirements.

### i. Management Indicator Species

A number of different guidelines were used to select the MIS for the IPNF. (AR 942: L-2). However, the Forest Plan recognizes that "[t]he key characteristic of management indicator species is that they are sensitive to management activities" and "[e]ndangered, threatened, sensitive species were automatically included." (AR 942: L-1, L-2).

_____

[9] Since 1982, the Forest Service has issued three new rules governing Forest Plans, all of which have been subject to legal challenge. *See Citizens for Better Forestry v. U.S. Dep't of Agriculture*, 341 F.3d 961, 967 (N.D. Cal. 2003) (finding plaintiffs had standing to challenge 2000 rule and remanding to district court where plaintiffs dismissed case upon stipulation when USDA announced intent to issue new rule); *Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 481 F. Supp.2d 1059 (N.D. Cal. 2007) (issuing nation-wide injunction prohibiting application of 2005 rule); *Citizens for Better Forestry v. U.S. Dept. of Agriculture*, 632 F. Supp.2d 968, n.1 (N.D. Cal. 2009) (declaring 2008 rule invalid and remanding to agency to determine whether 1982 or 2000 rules should be reinstated).

**REPORT AND RECOMMENDATION - 16**

Ultimately, the Forest Plan identified thirteen management indicator species with a documented presence in the IPNF.  These species fall within three broad categories:

(1)     threatened or endangered species:  bald eagle, grizzly bear, woodland caribou, and
        gray wolf;

(2)     "species commonly hunted, fished, or trapped animals whose habitat needs are affected by planned management activities:" white-tailed deer, moose, marten, cutthroat trout, rainbow trout, and bull trout; and

(3)     species whose population changes are believed to indicate effects of management activities on a major biological group or on water quality: pileated woodpecker and goshawk.

(AR 942: L-3).

The Forest Plan requires that forest management "[m]aintain at least minimum viable populations of these management indicator species distributed throughout the Forest."  (AR 942: II-28).  In addition, the Forest Plan provides guidance for monitoring and evaluating "[p]opulation trends of indicator species."  (AR 942:IV-7-11).  While the Forest Plan calls for annual MIS monitoring, it also contemplates that such monitoring may not be accomplished as indicated in the plan due to funding limitations and suggests that an analysis of "potential effects" is sufficient in those situations.  (AR 942: IV-9, 11).

### ii.     Old Growth Standards

The Forest Plan also establishes minimum old growth standards, in part to meet the habitat needs of the MIS.  The old growth standards are:

(1)     "Maintain at least 10 percent of the forested portion of the IPNF as old growth." ("Old Growth Standard 10(b)").

(2)     "Select and maintain at least five percent of the forested portion of those old-growth units that have five percent or more existing old growth."  ("Old Growth Standard 10(c)").

**REPORT AND RECOMMENDATION - 17**

(3)     "One or more old growth stands per old-growth unit should be 300 acres or larger.  Preference should be given to a contiguous stand; however, the stand may be subdivided into stands of 100 acres or larger if the stands are within one mile. The remaining old growth management stands should be at least 25 acres in size. Preferred size is 80 plus acres."  ("Old Growth Standard 10(f)").

(AR 942: II-29).

### iii.     The Proxy-on-Proxy Approach

The IPNF Forest Plan relies upon a so-called "proxy-on-proxy" approach to both MIS monitoring and species viability requirements.  In that approach, the indicator species serve as a proxy for other species and, in turn, the habitat requirements for the indicator species serve as a proxy for monitoring the indicator species.  Accordingly, by maintaining the habitat requirements of the indicator species, through the old growth requirements, the Forest Service assumes it will satisfy both the indicator species monitoring and species viability requirements.

The interconnection between habitat, management indicator species, and species viability requirements is fundamental to the wildlife management direction in the Forest Plan.  For example, the Forest Plan states, "[t]o help provide for a diversity of plant and animal communities, habitats, and species, standards for old growth maintenance will be established." (AR 942: II-5).  *See also* AR 942: V-3 ("The MMR for old growth is to maintain minimum viable populations of old-growth dependent species.").  The Forest Plan further provides:

> Habitat for vertebrate populations, other than threatened, endangered and sensitive species, will be managed to maintain viable populations (greater than 40 percent of maximum potential). In order to maintain viable populations of all species, the habitat will be managed for selected indicator species.

(AR 94: II-5).

**REPORT AND RECOMMENDATION - 18**

**2.      On the Facts of this Case, the Forest Service Acted Arbitrarily and Capriciously by Relying Upon the Old Growth Standards to Meet the Forest Plan Species Viability Requirements in the Project Area**

The parties agree that the Forest Service has a duty to ensure the viability of species throughout the IPNF.  The Forest Service relies upon the old growth standards in order to meet that duty and its related requirements, following a habitat-as-proxy approach.  Consistent with that approach, the Forest Service analyzed the Bussel 484 Project's impact on species viability with regard to the old growth standards.

Plaintiff argues that relying upon the old growth standards to meet those requirements is agency error, because both the standards and the methods used for measuring old growth are unreliable.  Plaintiff further argues that population trend monitoring data is especially important here because the Project Area has experienced significant habitat degradation and the Forest Service has not been able to confirm that old growth dependent species are still living in the Project Area.

As explained more fully below, the Court finds that the general approach to old growth standards and the method for measuring habitat using such standards are reasonably reliable. Nonetheless, relying upon the old growth standards to ensure species viability in the context of the Bussel 484 Project was an abuse of discretion in this case because (1) the Forest Service has no confirmation that any of the MIS actually exist in the Project Area and (2) it is undisputed that the old growth habitat in the Project Area has significantly degraded over time.  Despite scientifically reliable habitat standards and methods for measuring habitat, the record contains no evidence that any management indicator species actually inhabit the Project Area.  Under these circumstances, it was an abuse of discretion for the Forest Service to rely solely on the habitat-

**REPORT AND RECOMMENDATION - 19**

as-proxy approach to conclude that the Project will not threaten species viability because even if the assumptions underlying the habitat as proxy theory for the IPNF are sound in the abstract, the use of habitat-as-proxy for the Project Area fails its fundamental purpose.

Further, in relying upon habitat-as-proxy, the Forest Service failed to reconcile an important aspect of the problem and offered an explanation that runs counter to the evidence. The end result is so implausible that it cannot be defended as a difference in view or the product of agency expertise. *See Citizens of Overton Park, Inc. v. Volpe*, 401 U.S. at 415. Hence, that end result, even coming as it does after extensive effort by well-meaning scientists and Forest Service professionals, cannot withstand even a deferential judicial review. It sits on a foundation of sand. While the Court defers to the agency in matters of scientific expertise, the issue here is a matter of logic--it is a mistake to rely upon a theory when the evidence reflects that the theory is not working.

### a.      Legal Standard for Habitat as Proxy Approach

Courts have allowed the Forest Service to rely upon the habitat as proxy approach to MIS monitoring. "The 'proxy on proxy' approach to studying MIS population trends operates on the assumption that, as long as a species' habitat is maintained, the species will likewise be maintained. Thus, analysis of trends in the species habitat is, in essence, an indirect measurement of the species population trends." *Lands Council I*, 395 F.3d at 1036, n.23. Importantly, however, use of the habitat-as-proxy approach may be applied "only where both the Forest Service's knowledge of what quality and quantity of habitat is necessary to support the species and the Forest Service's method for measuring the existing amount of that habitat are reasonably reliable and accurate." *Native Ecosystems Council v. U.S. Forest Service,* 428 F.3d

**REPORT AND RECOMMENDATION - 20**

1233, 1250 (9th Cir. 2005); *see also Oregon Natural Resources Council Fund v. Goodman*, 505

F.3d 884, 890 (9th Cir. 2007).

    **b.**  **Reliability of the Old Growth Standards.**

   Plaintiff contends that the Forest Service "has never provided scientific support for its old

growth habitat standard" and has never actually determined how much habitat is necessary to

maintain viable populations of old growth dependent and management indicator species on the

IPNF. *Memorandum in Support of Plaintiff's Motion for Summary Judgment*, p. 12 (Docket No.

25). This is an overstatement. The old growth standards have a rational, scientific basis.

   As stated in the Final EIS for the Forest Plan (AR: 1024a: 120), the rationale for the old

growth standards is found in Planning Record 28, entitled "Old-Growth Management on the

IPNF." (AR: 1024b). The old growth recommendations contained in the report are based on the

minimum viable populations for two species: caribou and pileated woodpecker. (AR 1024b: 32-

37). Based on the minimum viable population for these two species, the Forest Service

developed habitat requirements and, based on these habitat requirements, developed the forest-

wide old growth standards. While the Forest Service admitted at that time that its knowledge

regarding the habitat requirements of the old growth dependent species was somewhat limited

(AR 1024b: 13), there is no evidence in the record to suggest that the conclusions were

unreasonable.

   Plaintiff further contends that "[e]ven if the standard was scientifically acceptable at the

time of Forest Plan enactment, more recent science has indicated that the standard used for this

project is no longer scientifically acceptable." *Memorandum in Support of Plaintiff's Motion for

Summary Judgment*, p. 12 (Docket No. 25). There is no getting around the fact that the IPNF old

**REPORT AND RECOMMENDATION - 21**

growth standard is now 25 years old and, therefore, potentially subject to the challenge of 25 years of additional scientific research.  However, as discussed more fully below, Plaintiff has not effectively demonstrated to this Court that subsequent science has so undermined the reliability of the old growth standards as to render them invalid.  In other words, based on the Administrative Record before it, the Court does not find that the Forest Service acted arbitrarily or capriciously by relying upon these standards.

### i.        The Scientific Integrity of the Ten Percent Rule

Plaintiff challenges Old Growth Standard 10(a), the ten percent, forest-wide old growth standard, based on a 1996 study prepared by research scientist, Peter Lesica, of the University of Montana Division of Biological Sciences.  *Plaintiff's Memorandum in Support of Motion for Summary Judgment*, p. 17 (Docket No. 25).  Lesica theorizes that "old growth occupied 20-50% of the presettlement forest landscape in low- and many mid-elevation habitats" and  "[a] reduction from 20-50% to less than 10% in old growth in low- to mid-elevation forests may well cause extirpation of many old-growth dependent species."  (AR 1035: 5).

The Ninth Circuit has previously considered whether the Lesica study presents a viable challenge to a similar ten percent old growth standard applicable to the Kootenai National Forest ("KNF") in Montana.  *See Ecology Ctr. v. Castaneda*, 574 F.3d at 659.  The KNF ten percent rule, like that on the IPNF, was developed to comply with the 1982 rules requiring that the Forest Service maintain habitat capable of supporting "viable populations" of old growth dependent species.  *Id.*  Accordingly, the Ninth Circuit did not consider the Lesica study a direct challenge to the ten percent old growth rule.  "Lesica's conclusion does not bear directly on the 'viable population' standard. The fact that levels of old-growth forest were significantly higher

**REPORT AND RECOMMENDATION - 22**

prior to European settlement in no way disproves the conclusion that ten percent is enough to support 'viable populations.'" *Id.*

The decision in *Ecology Center* is persuasive.  Moreover, an independent review of the Lesica study reveals that it does not present a direct challenge to the IPNF Old Growth Standard 10(a) because it does not directly address the reasoning behind the ten percent rule.  Indeed, Lesica's mention of the ten percent rule is not a central premise to, or finding of, his study.  His statement that "a reduction . . . to less than 10% in old growth . . .  may well cause extirpation of many old-growth dependent species" is essentially a hypothesis in need of further scientific support.  Accordingly, Plaintiff has not demonstrated that the ten percent rule is arbitrary and capricious.

### ii.  The Scientific Integrity of the 25-Acre Minimum Stand

Old Growth Standard 10(f) provides that old growth management stands should be at least 25 acres in size, but the preferred size is 80-plus acres:

> One or more old growth stands per old-growth unit should be 300 acres or larger.  Preference should be given to a contiguous stand; however, the stand may be subdivided into stands of 100 acres or larger if the stands are within one mile.  The remaining old growth management stands should be at least 25 acres in size.  Preferred size is 80 plus acres.

(AR 942: II-29).

Plaintiff relies upon two studies to support its argument that this standard is no longer valid.  First, Plaintiff cites to a Forest Service study authored by Jennifer Purvine ("Purvine Report"), indicating that stands as large as 80 acres would be considered far too small to meet the needs of most old forest dependent species.  The Purvine Report is not part of the administrative record here.  However, it was cited in a recent Idaho federal district court decision

**REPORT AND RECOMMENDATION - 23**

granting a preliminary injunction on the Salmon National Forest, in part, because it appeared that "the decision to designate old growth stands in blocks as small as 80 acres is no longer scientifically acceptable." *See Alliance for the Wild Rockies v. Wood,* CV 07-452, 2008 WL 2152237, at *3 (D. Idaho May 21, 2008).

Generally, in conducting an APA review of agency action, the district court is limited to the administrative record as it existed at the time of the agency decision. *Southwest Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). Nonetheless, there are exceptions to this general rule that provide for "extra-record evidence" in the following situations: (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith. *Id.*

Emphasizing that the Purvine Report was written by a Forest Service biologist, Plaintiff suggests that the Purvine Report is properly considered here because it speaks to whether the agency considered all relevant factors in explaining its decision. However, this Court finds that it would be inappropriate to consider the Purvine Report for the purpose of determining whether the Forest Service erred by relying upon the 25-acre minimum standard. The record is silent as to whether the IPNF management team had access to or knowledge of the Purvine Report, which was developed on the Salmon National Forest and was not brought forward during the public comment period. It is incumbent upon Plaintiff to raise these issues before the agency and allow the agency the opportunity to consider the challenge in the administrative process.

**REPORT AND RECOMMENDATION - 24**

Second, Plaintiff relies upon a second report--the Patla Report[10]–as evidence that the 25-acre minimum stand requirement is not reasonable.  According to the Patla Report, goshawks (one of the sensitive species identified by the IPNF) require stands of at least 180 acres for nesting areas.  *See Ex. 1, Plaintiff's Opposition to Defendants' Summary Judgment* (Excerpt of Patla Report (1997) (Docket No. 33-1). The Patla Report was submitted as part of Plaintiff's administrative appeal; however, it was cited at that time for the proposition that "[r]egeneration cuts will . . . impact goshawk foraging, because younger forest stands were identified as poor goshawk foraging habitat."  AR 169:30.  The Forest Service responded to the Patla report in connection with the foraging issue.  The Forest Service did not act capriciously by failing to anticipate some other objection ostensibly supported by the Patla Report, but never mentioned by the Plaintiff in the decision making process.

Moreover, in opposition to Plaintiff's arguments that subsequent science has seriously undermined the reliability of the Forest Plan old growth standards, the Forest Service cites to more recent research indicating that the standards are reliable.  (AR 901:38-40, 69-70) ("A Conservation Assessment of the Northern Goshawk, Black-backed Woodpecker, Flammulated Owl, and Pileated Woodpecker in the Northern Region, USDA Forest Service") ("Samson Study").  In the face of this conflicting evidence, the Court defers to the agency on the issue of the scientific integrity of the minimum 25-acre minimum stand.  Based on the record before the agency, it was entirely reasonable to conclude that the science behind the 25-acre minimum stand is reasonably reliable.

---

[10]  Susan M. Patla, Nesting Ecology and Habitat of the Northern Goshawk in Undisturbed and Timber Harvest Areas on the Targhee National Forest, Greater Yellowstone Ecosystem. (unpublished M.S. thesis Idaho State University).

**REPORT AND RECOMMENDATION - 25**

In sum, in light of the evidence in the Administrative Record, the Court finds no reason

not to defer to the agency in this matter of technical expertise.  The initial old growth standards

appear to be based on a thoughtful consideration of the habitat needs of the caribou and pileated

woodpecker and there is nothing in the administrative record to indicate that the standards are no

longer reasonably valid.  Moreover, even if a dispute existed, the Forest Service has pointed to

evidence to support its conclusion that the old growth standards are still valid.  Accordingly, the

Court will defer to the agency and finds no error in the scientific integrity or reliability of the old

growth standards.

<strong>c.       Reliability of Defendants' Methods for Measuring Existing Habitat</strong>

The Forest Service has concluded that the IPNF satisfies the Forest Plan's old growth

standards and the Project will not affect any old growth stands.  Plaintiff generally contends that

the Forest Service's method for measuring the existing amount of old growth habitat was not

reasonably reliable and accurate.  More specifically, Plaintiff contends: (1) the Timber Stand

Management Recording System ("TSMRS") database may provide inaccurate records of logging

activities and, in some cases, may not record logging activities at all; (2) the majority of the

stand data used was at least seven years old (38 of 64 stands), and some of the data was 20 years

old (ten stands); and (3) the flaws in the habitat model were apparent upon field review of the

model's projections.  *Memorandum in Support of Plaintiff's Motion for Summary Judgment*, pp.

13-14 (Docket No. 25).  According to Plaintiff, the field reviews indicated a modeling error rate

of 68-70%.  (AR 463:8).

Nonetheless, the Court is satisfied that the Forest Service's methodology for measuring

habitat was reasonably reliable.  As Judge Lodge noted less than a year ago in *Lands Council v.*

*McNair*, CV 06-425, 2009 WL 3199641 (D. Idaho Sept. 30, 2009), the TSMRS database has

been through a recent, comprehensive upgrade to ensure it provides accurate records and was subject to further site-specific review in the context of the instant project. Here, the Court is satisfied that the data used was relatively recent and also subject to site verification. The record reflects that the majority of the old growth stand data used was based on exams conducted between 2002 and 2006 (AR 2:151-52) and 355 individual stands were reviewed for habitat suitability. (AR 2:119, 131, 132, 244, 245, 258, 270-71, 275).

Moreover, with regard to Plaintiff's claim concerning the error rate of site verification, the parties interpret the same data in a different manner. The Forest Service explains that it reviewed 319 stands in the wildlife analysis area and determined, from aerial photos and other information sources, that 33 of these stands required field verification. (AR 462:1). In reviewing these stands, and considering both "suitable habitat" and "marginally or possibly suitable habitat" in its determination, the Forest Service determined that the databases were fairly accurate with regard to what stands "could provide some level of habitat." *See Defendants' Opposition to Plaintiff's Summary Judgment*, p. 8 (Docket No. 35) (citing AR 463). Based on the record before it, the Court finds that it was reasonable for the Forest Service to incorporate "marginally or possibly suitable habitat" in its calculation of old growth habitat.

Given recent case law concerning the quality of the databases upon which the Forest Service relies, the site-specific verification process, and what appears to be a reasonable interpretation of the data, the Court concludes that the Forest Service's general methodology for calculating old growth is reasonably reliable. Moreover, as explained more fully below, the Forest Service's findings with regard to each of the old growth standards challenged here were supported by substantial evidence in the record.

**REPORT AND RECOMMENDATION - 27**

i.      **Evidence Supports Defendants' Conclusion that the IPNF Satisfies Forest Plan Standard 10(b): the Ten Percent Rule**

The Forest Service cites to four reports and a field verification study in support of the conclusion that the over-all 10% old growth standard is being met.  First, the 2004 IPNF Forest Planning report, relying upon the FIA database, determined that 12.8% of the forested acres on the IPNF met the old growth criteria.  (AR 287: 1, 9).  Second, using the same FIA database but with a more conservative method for estimating tree age, an April 2006 assessment of the IPNF reported that approximately 11.8% of forested lands on the IPNF met the old growth criteria.  (AR 288: 3).  Third, two subsequent reports, dated July 2006 and May 2007, both confirmed the FIA-derived estimate of approximately 11.8% old growth on IPNF's forested lands.  (AR 290: 6, AR 291:6).  In addition, the Forest Service conducted reviews of the individual forest stands in 2004 and 2006 and confirmed that the IPNF has mapped and allocated 12.1% of its forested lands for management as old growth.  (AR 287:6, 290:6).  This evidence is sufficient to support the Forest Service's conclusion that the ten percent, forest-wide rule is being met.

ii.     **Sufficient Evidence Supports Defendant's Conclusion that OGMU Eight Satisfies Forest Plan Standard 10(c): the Five Percent Rule**

Plaintiff argues that the Forest Service's most reliable habitat database, the FIA database, indicates that there is only 4.3 % old growth in the Project Area.[11]  *Plaintiff's Memorandum in Support of Motion for Summary Judgment*, p. 18 (Docket No. 25).  However, Standard 10(c) does not refer to the Project Area; it refers to old growth management units, and the FIA

---

[11]  The Forest Service also contends that Plaintiff's data refers not to the Project Area, but to the much larger Landscape Area.  *Defendants' Opposition to Plaintiff's Summary Judgment*, p. 7 (docket No. 35).  Either way, the correct geographic focus should be the OGMU as directed by Old Growth Standard 10(c).

database reflects that OGMU Eight has 19% existing old growth, thus satisfying Standard 10(c). (AR 284, AR 2: 152, 154).

> ### iii.   Sufficient Evidence Supports Defendant's Conclusion that OGMU Eight Satisfies Forest Plan Standard 10(f): the Minimum 25-Acre stand Rule.

Plaintiff argues that the TSMRS/FSVeg database reflects that 0% of the existing old growth stands in OGMU Eight are at least 80 acres.  However, the Forest Service relies on this same database to support their conclusion that OGMU Eight contains nine patches larger than 80 acres; eight patches larger than 100 acres; and a single patch of 595 acres (AR 2:154), thus satisfying Old Growth Standard 10(f).   In so doing, the Forest Service decided that, in calculating the size of old growth stands in an OGMU, it is appropriate to patch together old growth stands partially within OGMU Eight with adjacent or nearby stands and to give credit for "potential old growth[12]."  (AR 292,93).  *See Defendants' Opposition to Plaintiff's Motion for Summary Judgment*, p. 9 (Docket No. 35).  The Forest Service defends this approach, saying that it "reflects the direction in the Forest Service's old growth criteria to use landscape ecology considerations, as well as individual stand attributes, in selecting land to be allocated as old growth." *Id.*

On balance, the record indicates that the Forest Service made a rational decision based on "landscape ecology considerations."  Hence, the Court concludes that the Forest Service, the agency with the technical expertise and charged with implementing NFMA, the NFMA regulations, and the IPNF Forest Plan, has appropriately interpreted Old Growth Standard 10(f)

---

[12]   The Forest Service further contends that "potential old growth" includes stands with more than enough large trees to meet old growth criteria, but the trees are not quite old enough (AR 287:5).

**REPORT AND RECOMMENDATION - 29**

to allow it to include "patches" of old growth partially contained within the OGMU and "potential old growth" for the purpose of determining the old growth stand sizes within a single OGMU.

In short, the Court is satisfied with the methods used for analyzing the stand data. Accordingly, the Forest Service has demonstrated that OGMU Eight satisfies Old Growth Standard 10(f).  *See also Alliance for the Wild Rockies v. Wood*, 2008 WL 2152237, *3 & n. 3(D. Idaho May 21, 2008) (permitting Forest Service to count verified old growth and potential old growth in determining whether Salmon National Forest was meeting its old growth standards).

### d.    Relying on the Habitat-as-Proxy Approach Here Is An Abuse of Discretion, Because It Is Contradicted by Site-Specific Evidence.

As discussed above, on the record of this case, the Forest Service's old growth standards and methods for measuring habitat are reasonably reliable in theory.  Nonetheless, the Forest Service erred by relying exclusively upon the habitat-as-proxy approach here because it did not address the uncontroverted evidence in the record that the old growth standards have not adequately ensured species viability in the Project Area.

In authorizing the Project, the Forest Service determined that "[v]iable populations of management indicator species (elk, marten, moose, goshawk, and pileated woodpecker) will be maintained."  (AR 3:55).  However, neither the DEIS, FEIS, or ROD contains evidentiary support for the conclusion that there are any populations, much less viable populations, of old growth MIS in the Project Area to maintain.  There are no populations estimates nor are there suggestions as to what a viable population might be.  In addition, the last MIS monitoring report in the record is from 1993 (AR 949:33-34), and the Forest Service did not know the population

**REPORT AND RECOMMENDATION - 30**

trends of any of its MIS when it planned the Project.  (AR 976:38).  Instead, the Forest Service

relies solely upon the old growth standards to meet its species monitoring and viability

requirements.

A decision to continue to rely upon a habitat-as-proxy approach against such facts is

either a Panglossian view that all will be well with the management indicator species despite the

lack of any non-hypothetical evidence to support such a view, or it is the archetypical illustration

of what can happen when form is exalted over substance.  Whichever it might be, in this setting

it is an abuse of discretion by the agency.  The complete absence of old growth management

indicator species in the Project Area renders implausible the assumption that the habitat-as-proxy

approach satisfies the Forest Service's species monitoring and viability requirements set forth in

the Forest Plan.  Without any indication that there are viable populations in the Project Area or

what might constitute viable populations for these species, the Forest Service lacked any

evidentiary support for its conclusion that viable populations of MIS will be maintained after the

Project is implemented.

### i.      No Evidence of Old Growth MIS in the Project Area

The old growth standards on the IPNF were developed based upon the habitat needs of

the MIS pileated woodpecker and endangered woodland caribou.  However, neither of these

species is found within the Project Area.  This is true even though Forest Service modeling

suggests eight hypothetical pileated woodpecker ranges in the Project Area.  (AR 2:269, 279).

Similarly, fisher, marten, goshawk, and Canada lynx are all sensitive species associated

with old growth but have been detected only outside the Project Area.  (AR 2:284-287).  Based

on modeling, the Forest Service assumed 19 hypothetical nesting areas for the northern goshawk

**REPORT AND RECOMMENDATION - 31**

within the Project Area (AR 2:275), yet after five days of field study, there was no sign that goshawks inhabit the area.[13] [14]  (AR 482: 1-5).

The Forest Service contends that the lack of sightings of certain species does not indicate that the Forest Service has failed to meet its species monitoring and viability requirements, because the argument "relies on the incorrect premise that the habitat as proxy approach cannot be used on the IPNF. . . ."  *Defendants' Opposition to Plaintiff's Summary Judgment*, p. 13 (Docket No. 35).  This is not true.  The habitat as proxy approach is premised upon the assumption that, by taking care of old growth habitat needs of the MIS, the Forest Service can ensure the viability of all species.  This theory has a rational basis and should work where, as here, the habitat model underlying the old growth standards and the method for measuring habitat are reasonably reliable.  Nonetheless, the ultimate test for whether the habitat as proxy approach is permissible is "whether it 'reasonably ensures that the proxy results mirror reality." *See Gifford Pinchot Task Force v. United States Fish & Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir. 2004) (quoting *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d at 972-73).  Here, the most compelling evidence suggests that the theory, applied in this Project Area, does not match reality.  The lack of species sightings, otherwise ignored and unexplained by the Forest Service, undermines the assumption that by taking care of habitat, the IPNF can ensure species viability.

---

[13] The Forest Service points to evidence of a *possible* goshawk nesting area; nonetheless, the record reflects that no goshawks or goshawk nests have been seen in the Project Area.  (AR 505, AR 2:262).

[14]  Plaintiffs have also pointed to evidence in the administrative record that red tailed hawks have been sighted in the areas, an indication that the habitat is no longer suitable for the goshawk.  *See* Ex. 1, *Plaintiff's Memorandum in Support of Summary Judgment,* La Sorte *et al*, "Habitat Associations of Sympatric Red-Tailed Hawks and Northern Goshawks on the Kaibab Plateau" (2004)  (Docket No. 26-1).

**REPORT AND RECOMMENDATION - 32**

The Forest Plan requires that the Forest Service ensures the existence of viable populations of species, not the theoretical possibility that the species should be present. Moreover, without any indication that there are viable populations of MIS in the Project Area before the Project, it is unclear how the Forest Service could conclude that viable populations of MIS will be maintained after the Project.

Put another way, there is evidence in the record that effectively rebuts the presumption that the habitat-as proxy-approach is taking care of the species viability in the Project Area. The Forest Service has failed to adequately address or explain this evidence or describe more adequately the potential reasons why the MIS have not been located in the Project Area. Hence, the Forest Service has failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence, and relied upon a theory that, as applied, is so implausible that it cannot be ascribed to a difference in view or the product of agency expertise. Accordingly, the decision to rely exclusively upon the old growth standards to meet the Forest Plan requirements for MIS monitoring and ensuring species viability in the Project Area was in error and the decision authorizing the Project must be set aside, because the Project's effect on species viability has not been addressed.

This analysis is consistent with the Ninth Circuit's recent decision in *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 935 (9th Cir. 2010) (holding nonexistent MIS cannot serve as proxy).[15] In *Tidwell*, a Ninth Circuit panel reversed a Montana district court decision upholding the Forest Service's use of a proxy-on-proxy approach to species viability requirements. The

---

[15] The Forest Service has petitioned the Ninth Circuit for a rehearing en banc, *see Defendants' Supplemental Response to Plaintiff's Notice of Supplemental Authority* (Docket No. 50).

**REPORT AND RECOMMENDATION - 33**

Ninth Circuit held that the proxy-on-proxy approach was not reliable, because the MIS used to

determine appropriate habitat, the sage grouse, did not exist in the area being analyzed and there

was evidence in the record suggesting that the sage grouse population in the larger geographic

area was trending downward.  On that record, the Ninth Circuit said "[i]t is unfathomable how

the Forest Service could meet its responsibility to maintain existing species by selecting as a

proxy a species that is virtually non-existent in the targeted area."  *Id.*

 In contrast, there is no indication here that the population trends of the MIS have been

diminishing.  However, the Administrative Record reflects that MIS have not been monitored on

the IPNF since 1993 (AR 949:33-34).  Thus, there is no recent evidence concerning the MIS

population trends at all.

 Moreover, there is evidence in the record that the old growth habitat in the area has

degraded over time, despite compliance with old growth standards, and that the old growth

standards, though reasonably reliable, are based on relatively stale science.  This provides further

support for the conclusion that the old growth standards alone may not be ensuring species

viability in the Project Area and renders the Forest Service reliance upon such standards an

abuse of discretion.

### ii.    Habitat degradation

 There is no dispute that there has been a "substantial reduction of older forest structures

compared to historic structures" throughout the region.  (AR 2:147).  This trend is reflected in

the IPNF.  "There are fewer stands typified by an old, open overstory of large early-seral species

with an understory of mixed species of varying shade tolerances.  Stands typified by small and

medium-sized young trees have increased."  (AR 2:147).  It is also reflected in the Project Area,

**REPORT AND RECOMMENDATION - 34**

where "[t]here is a trend away from mature/old and old growth forest structure, toward smaller trees."  (AR 2:147).  The Forest Service acknowledges that this trend results in a loss of habitat for old growth dependent species.  (AR 2: 148).

Ironically, the Project  was designed, in large part, to address this downward trend in old growth and habitat degradation.  One central component of the Project is to "[m]aintain or improve resilience of the vegetative resources to disturbances such as insects, disease and fire."  (AR 3:5).  The same conditions that create a higher risk of disturbance as the result of insects, disease, and fire are, in large part, the same conditions causing a degradation of habitat.  As the ROD describes, the Project is intended, in part, to "[p]romote or maintain large-diameter trees, snags, coarse woody debris, and stands dominated by large diameter trees."  (AR 3:5).

Significantly, the degradation of habitat is further evidence suggesting that there are challenges to old growth species viability in the Project Area that are unaccounted for by the old growth standards.  When it is undisputed that the habitat has been altered and there is no evidence of MIS in the Project Area, it is unreasonable for the Forest Service to continue to argue that the old growth standards alone are ensuring species viability.

### iii.   Stale Science

The 1982 regulations assumed that each Forest's plan would be updated every 15 years.  There is no indication that this happened, at least with regard to the old growth standards.  In addition, at the time the old growth standards were developed, the Forest Service admitted that its knowledge regarding "the relationships of . . . animals to old-growth ecosystems [was] somewhat limited."  (AR 1024b:13).  Further, the Forest Plan indicated that more research was necessary to determine "to what extent" wildlife species "depend on old-growth systems."  AR

**REPORT AND RECOMMENDATION - 35**

942: 43-44.  While the Forest Service has not erred by relying upon the science behind the old

growth standards, the time that has elapsed since that admittedly uncertain science was applied

to the IPNF undermines its persuasiveness.

In sum, while the science behind the old growth standard may be sound (i.e. based on a

rational determination of what habitat should support species viability) and the methods for

measuring habitat reasonably reliable, it was unreasonable to rely upon habitat alone to meet

Forest Plan species monitoring and viability requirements and properly analyze the Project's

effect on MIS and other old growth dependent species in the Project Area.  The evidence here

suggests that the habitat as proxy approach applied to the Project Area is hollow at its core.

## C.      Plaintiff's NEPA Challenges to the Project

"NEPA was passed by Congress to protect the environment by requiring that federal

agencies carefully weigh environmental considerations and consider potential alternatives to the

proposed action before the government launches any major federal action."  *Lands Council I*,

395 F.3d at 1026.  NEPA is a procedural statute; it does not contain additional substantive

provisions or mandate particular results.  *Robertson v. Methow Valley Citizens Council*, 490 U.S.

332, 350 (1989).  The goal of NEPA is two-fold: (1) to ensure the agency will have detailed

information on significant environmental impacts when it makes its decisions; and (2) to

guarantee that this information will be available to a larger audience.  *Id.* at 349.

Pursuant to NEPA, the Forest Service must prepare an environmental impact statement

("EIS") for "every recommendation or report on . . .major Federal actions significantly affecting

the quality of the human environment."  42 U.S.C. § 4332(C).  When determining the sufficiency

of an EIS, courts generally employ a "rule of reason [standard] to determine whether the

**REPORT AND RECOMMENDATION - 36**

[environmental impact statement] contains a 'reasonably thorough discussion of the significant aspects of the probable environmental consequences.' " *Kern v. United States Bureau of Land Mgmt.*, 284 F.3d 1062, 1071 (9th Cir.2002) (internal citation omitted).  Essentially, the rule of reason standard is applied in the same manner as the arbitrary and capricious standard.  *See Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir.1998).

Plaintiff contends that The Forest Service violated NEPA by: (1) failing to ensure the scientific integrity of the Forest Plan's old growth standard; (2) failing to assess the cumulative impacts of the fire management policy; (3) illegally tiering the Project to the IPNF's now withdrawn Fire Plan; and (4) failing to prepare a supplemental EIS for the Project after the Fire Plan had been withdrawn.

### 1.     Scientific Integrity of the Forest Plan Old Growth Standard

Plaintiff claims that the EIS does not: (1) disclose the underlying hard data and scientific analysis that supports its old growth standards; (2) disclose that the standards are "controversial and uncertain," or (3) discuss the responsible opposing viewpoints.  *Plaintiff's Memorandum in Support of Summary Judgment*, pp. 21-22 (Docket No. 25).

First, NEPA regulations require that:

> Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix.

40 C.F.R. § 1502.24.  Second, NEPA requires the disclosure of scientific controversies and uncertainties.  *See Seattle Audubon v. Espy*, 998 F.2d 699, 704 (9th Cir. 1993); 40 C.F.R.

**REPORT AND RECOMMENDATION - 37**

§ 1502.22 (agency must disclose incomplete or unavailable information relevant to evaluation of reasonably foreseeable adverse effects).  Third, agencies must respond to any responsible opposing scientific viewpoint that undermines the assumptions or assertions that are fundamental to the agency's analysis.  *Center for Biological Diversity v.  U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003); 40 C.F.R. 1502.9 (final environmental impact statements must respond to public comments and discuss responsible opposing views).

The Forest Service argues that it conducted the appropriate environmental analysis of the old growth standards when the Forest Plan was adopted and there was no need for the Forest Service to repeat or revisit its analysis in the Project EIS, especially because the Project does not propose to harvest any old growth.  This is short-sighted and falls short of the NEPA requirements.  If the Forest Service is made aware of a reasonable scientific challenge to the old growth standards set forth in the 1987 Forest Plan, then the Forest Service must address the challenge in the NEPA process applicable to site-specific action taken in reliance upon the old growth standards.  To hold otherwise would allow the Forest Service to rely upon science that lacks the requisite integrity to ensure that the agencies take a "hard look" at the environmental effects of proposed federal action.  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. at 352.

The Court has concluded that the scientific evidence put forward by Plaintiff did not create a legitimate dispute upon the old growth standards.  The Lesica study does not address the science behind the ten percent rule so much as to leapfrog it, drawing from assumptions made about the nature of the forest prior to the Westward Expansion.  The Purvine Report was not part of the administrative record, and the Patla Report was cited for a different proposition.

**REPORT AND RECOMMENDATION - 38**

Therefore, on the record before the agency at the time of the decision, the Forest Service did not

err by failing to disclose these scientific challenges.

Nonetheless, because the Forest Service failed to consider the Project's effects on species

viability, the EIS violates NEPA.  The EIS contains an incomplete analysis of the Project's

impact on old growth dependent, MIS, and sensitive species.  *See Seattle Audubon v. Espy*, 998

F.2d at 704-05.

### 2.    Assessing Cumulative Impacts of the 2008 Fire Plan

To provide sufficient analysis of environmental impacts under NEPA, an EIS must

consider cumulative impacts applicable to the agency action under consideration.  *See Neighbors

of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d at 1379.  "NEPA requires that where "several

actions have a cumulative . . . environmental effect, this consequence must be considered in an

EIS."  *Id.* (quoting *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1312 (9th Cir. 1990)).

"'Cumulative impact' is the impact on the environment which results from the incremental

impact of the action when added to other past, present, and reasonably foreseeable future actions

. . . ."  40 C.F.R. § 1508.7.

Plaintiff argues that the Project EIS is contrary to law because it implements the direction

of the now-withdrawn 2008 Fire Plan without assessing the cumulative impacts of the Fire Plan

at the forest-wide level.  *Plaintiff's Memorandum in Support of Summary Judgment*, p. 22

(Docket No. 25).  Plaintiff's argument is unavailing.  The Fire Plan has been withdrawn;

therefore, there is no need to analyze its impact on a forest-wide scale either in the context of a

Fire Plan EIS or in the Project EIS.

**REPORT AND RECOMMENDATION - 39**

### 3.     Improperly Tiered to Fire Plan

Plaintiff argues that the forest-wide 2008 IPNF Fire Plan is illegally tiered to the Project

EIS.  As the NEPA regulations provide:

> Tiering refers to the coverage of general matters in broader
> environmental impact statements (such as national program or
> policy statements) with subsequent narrower statements or
> environmental analyses (such as regional or basinwide program
> statements or ultimately site-specific statements) incorporating by
> reference the general discussions and concentrating solely on the
> issues specific to the statement subsequently prepared.

40 C.F.R. § 1508.28.  Generally, tiering is appropriate in two situations.  First, tiering may be

used "[f]rom a program, plan, or policy environmental impact statement to a program, plan, or

policy statement or analysis of lesser scope or to a site-specific statement or analysis."  *Id.*

Second, tiering may be used:

> From an environmental impact statement on a specific action at an
> early stage (such as need and site selection) to a supplement
> (which is preferred) or a subsequent statement or analysis at a later
> stage (such as environmental mitigation). Tiering in such cases is
> appropriate when it helps the lead agency to focus on the issues
> which are ripe for decision and exclude from consideration issues
> already decided or not yet ripe.

*Id.*

Again, because the Fire Plan has been withdrawn, Plaintiff's argument is unavailing.

Moreover, while the FEIS considered the impact of fire under the direction of the Fire Plan, there

is no indication that the FEIS was somehow tiered to the 2008 Fire Plan and even if the 2008

Fire Plan relied upon the Project EIS analysis, it has been withdrawn

**REPORT AND RECOMMENDATION - 40**

### 4.      Preparation of a Supplemental EIS

NEPA imposes on federal agencies a continuing duty to supplement existing

environmental impact statements in response to significant new circumstances or information

relevant to environmental concerns and bearing on the proposed action or its impacts.  40 C.F.R.

§ 1502.9(c)(1)(ii); *see Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 561 (9th Cir.

2006).  Here, the question is whether the cumulative impact of fire and fire management is a

"significant new circumstance" relevant to the Project EIS analysis of the cumulative impact of

fire and fire management on the Project Area.

Plaintiff argues that the Forest Service must conduct a supplemental EIS, because

withdrawal of the 2008 Fire Plan following the FEIS and ROD constitutes a significant change

in circumstances.  Plaintiff further argues that the current "fire management plan," though

unwritten, requires a full EIS for the "Forest Service to consider the Forest-wide cumulative

impacts of its fire management policy."  *Plaintiff's Reply in Support of Summary Judgment*, p.

15 (Docket No. 15).

The issue of whether the current, unwritten fire management plan requires an EIS is not a

proper subject of this suit as it is not clearly relevant to any of the claims or defenses set forth in

the pleadings.  In addition, the Court has already determined that the decision authorizing the

Project violated both NFMA and NEPA for failure to consider properly the Project's impact on

species viability.  Accordingly, and as discussed more fully below, the decision authorizing the

Project must be set aside and the matter remanded to the Forest Service, so the Forest Service

can decide how next to proceed.  To the extent a supplemental EIS is prepared, this EIS must

address the current IPNF fire management policy in its analysis of cumulative impacts.

**REPORT AND RECOMMENDATION - 41**

The Forest Service contends that no supplemental NEPA analysis is required, because the withdrawn 2008 Fire Plan and current fire management direction are both consistent with the Forest Plan.  Therefore, the change in fire policy did not cause a change in management direction or a "significant new circumstance."

Nonetheless, just because the 2008 Fire Plan and current fire plan are consistent with the Forest Plan does not necessarily mean that the change in policy cannot constitute a "significant new circumstance."  Within the Forest Plan's general fire standards, there is room for the Forest Service to manage fire in different ways with different priorities and environmental impacts.  For example, under the Fire Plan, the IPNF was divided into different fire management units and all fires within the "wildland-urban interface" were deemed unwanted events that would be suppressed.  (AR1037:32-33).  In contrast, the current fire policy does not require that all fires be suppressed but allows for a cost-benefit analysis to fire suppression.  (AR 942: 69, 85, 106).  These are significant changes in policy permitted under the general Forest Plan fire management guidance.

In addition, the FEIS was updated to account for a change in management direction from the standards in the Forest Plan to the standards in the 2008 Fire Plan.  "Fire management plan direction was updated to include direction from the 2008 IPNF Fire Management Plan."  (AR 2:129).  If that change required an updated analysis of fire, then it must be presumed that a change back to the Forest Plan standards also requires an updated analysis.  Accordingly, to the extent the Forest Service decides to move forward with this Project, any future analysis of the Project's environmental impact must address the cumulative impact of fire and fire management under whatever policy is in place at the time the environmental impact statement is drafted.

**REPORT AND RECOMMENDATION - 42**

**D.      Injunctive Relief**

The undersigned recommends that the Court grant summary judgment on Plaintiff's claims that the Forest Service violated NFMA and NEPA by failing to consider adequately the Project's effect on the viability of old growth dependent, sensitive, and management indicator species.  For relief, Plaintiff seeks a declaratory judgment and asks that the Court: (1) set aside the agency's decision; (2) enjoin the Forest Service from awarding any further timber sales pursuant to the Project; (3) enjoin any logging pursuant to the Project timber sales already awarded; and (4) award Plaintiff its costs, expenses, expert witness fees, and reasonable attorneys' fees.  For the reasons set forth below, it is recommended that the district court set aside the agency's decision authorizing the Project and either issue a permanent injunction prohibiting all future sales and logging authorized by the Project or hold a hearing to determine whether such an injunction should issue.  *See Monsanto Co. v. Geertson Seed Farms*, --- U.S. ----, 2010 WL 2471057 (2010).  A decision concerning attorneys' fees and costs should be made at a later date upon a separate motion.

The Supreme Court has recently made clear that, even in environmental cases, Plaintiff has the burden of establishing the following four factors before the Court may issue injunctive relief: "'(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'"  *Id.* at *11 (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  "The court's decision to grant or deny injunctive or declaratory relief under [the] APA is controlled by principles of

**REPORT AND RECOMMENDATION - 43**

equity." *National Wildlife Fed'n v. Espy*, 435 F.3d 1337, 1343 (9th Cir. 1995).  Accordingly, "[a]n injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'"  *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 311-12 (1982) (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)).

When determining whether an injunction should issue, the Court must conduct a traditional "balance of harms" analysis.  "The district court must weigh 'the competing claims of injury . . . and the effect on each party of the granting or withholding of the requested relief.'" *National Wildlife Fed'n v. Espy*, 45 F.3d at 1343 (quoting *Amoco Production Co.*, 480 U.S. at 542).  Moreover, any injunction issued must be narrowly tailored to give only the relief to which plaintiffs are entitled.  *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990).

Here, Plaintiff generally contends that the injunction should issue in order to protect the environment from irreparable harm and ensure that the Forest Service complies with applicable law.  According to Plaintiff, the harm the Forest Service alleges is economic in nature and compensable; whereas, the harm Plaintiff alleges, to the environment and species relying upon that environment, is irreparable.

The Forest Service contends that an injunction should not issue, because the Project, in the long term, will reduce the potential for high severity or intensity fires, insect infestation, drought and disease.  The Forest Service also contends that the Project will manage access to provide for multiple uses and provide economic benefits to the local economy.

On balance, the equities here weigh in Plaintiff's favor.  First, Plaintiff has demonstrated that irreparable injury is likely in the absence of an injunction.  *See Winter v. Natural Resources*

**REPORT AND RECOMMENDATION - 44**

*Defense Council*, --- U.S. ---- (2008).  It is undisputed that no MIS have been found in the

Project Area and the Project will further affect the species' habitat, even though the Project does

not propose to harvest old growth.  In addition, the threatened harm, the failure to provide for

species viability, is irreparable.  Although it is difficult to determine how "likely" the harm

would be absent an injunction, the Court is ultimately swayed by the fact that the MIS have not

been found in the Project Area, thus indicating, according to the Forest Service's species proxy

approach, that the other species are probably not doing well.  Thus, the further elimination of

MIS habitat occasioned by the logging and road construction authorized by the Project is of

grave concern.  Because it is undisputed that the Project will have a negative impact on the MIS

species, and there is no indication that they are otherwise doing well in the Project Area, the

Court must conclude that there is a likely risk of irreparable injury absent an injunction.

Second, remedies available at law, such as money damages, cannot compensate for the

alleged threat to species viability.  The value of the presence of sensitive and desired species in a

woodland environment is immeasurable.  Even though that value can be weighed against

competing values, it is a value that does not lend itself to monetary equivalency.

Third, on balance, the weight of harms tilts in Plaintiff's favor.  In making this

determination, the Court is highly aware and sensitive to the needs of the local communities and

lumber companies who depend upon timber sales upon the public land.  These interests are

extremely valuable to our society and the rural communities surrounding our federal forests.

Nonetheless, weighing the potential for irreparable harm against harms that are primarily

monetary and, thus, compensable in nature, the Court must find that, on balance, Plaintiff's

alleged harms carry more weight.

**REPORT AND RECOMMENDATION - 45**

Fourth, the public interest also weighs in Plaintiff's favor.  There are competing public interests involved here, as there so often are in the multiple-use management context. Defendants contend that the Project will further the public interest in providing jobs and logging contracts to the local community; reducing the risk of fire, insects, drought and disease; and providing for multiple use access.  However, as previously stated, the potential economic harm is largely compensable.  Moreover, any of the current risks of fire, insects, drought, and disease existing in the Project Area has existed for some time and allowing the sales to move forward despite their unlawfulness is no guarantee that these risks will be reduced.  In addition, there is no indication that the access provided for multiple uses would differ significantly depending upon the issuance or denial of injunctive relief.  Thus, the public interest in sustaining wildlife and ensuring that federal agencies comply with federal law has to outweigh the competing interests in providing economic benefits to the local community; reducing risks of fire, insects, drought, and disease; and providing access for multiple use.

For these reasons, the undersigned finds that Plaintiff has demonstrated that an injunction should issue.  Accordingly, it is recommended that the district judge: (1) set aside the Forest Service's decision authorizing the Project; (2) remand the matter to the agency; and (3) issue a permanent injunction prohibiting any future activity under the current lumber sales and any future lumber sales authorized under the Project until and unless the Forest Service has undertaken a proper review of the Project's impact on species viability in the Project Area.

Alternatively, if the district judge is not satisfied with the evidence in the record relevant to establishing injunctive relief, it is recommended that the district judge order a show cause hearing.  Prior to the Supreme Court's decision in *Monsanto Co. v. Geertson Seed Farms*, ---

**REPORT AND RECOMMENDATION - 46**

U.S. ----, 2010 WL 2471057, there was a line of Ninth Circuit decisions suggesting that an

injunction is the proper remedy for a NEPA violation[16] absent unusual circumstances.  *See Idaho*

*Watersheds Project v. Hahn*, 307 F.3d 815, 833 (9th Cir. 2002); *National Parks & Conservation*

*Ass'n v. Babbitt*, 241 F.3d 722, 737, n. 18 (9th Cir. 2001).  The Supreme Court has now made

clear that even where Plaintiff is successful on the merits of a NEPA claim, Plaintiff still has the

burden of demonstrating all four factors necessary to establish a right to injunctive relief.  *See*

*Geertson Seed Farms*, --- U.S. ----, 2010 WL 2471057, *11-12.  Therefore, given what appears

to be a slight remodeling of the prior law within the Ninth Circuit resulting from the ruling in

*Geertson Seed Farms*, the district judge may choose to hold a show-cause hearing before

deciding upon injunctive relief.  Nevertheless, the undersigned finds the evidence sufficient to

award injunctive relief in this case.

## V.  RECOMMENDATION

In light of the foregoing, the undersigned United States Magistrate Judge recommends

that the Court grant summary judgment to Plaintiff with regard to Counts Two and Five of the

Second Amended Complaint because Defendants violated both NFMA and NEPA in their failure

to ensure species viability in the Project Area.  It is further recommended that the agency action

be set aside and any action authorized by the Project be enjoined unless and until the Forest

---

[16]  While this analysis addresses the issue of injunctive relief flowing from a NEPA
violation, it would appear that the same analysis is true for other, similar environmental law
violations brought pursuant to the APA.

**REPORT AND RECOMMENDATION - 47**

Service has conducted an analysis of the Project's impact on species viability that meets NFMA and NEPA standards.



DATED:  **July 2, 2010**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge

**REPORT AND RECOMMENDATION - 48**