UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

THE LANDS COUNCIL,

                    Plaintiff,

        v.

JANE COTTRELL, Acting Regional
Forester of Region One of the U.S. Forest
Service; RANOTTA McNAIR,
Supervisor of the Idaho Panhandle
National Forest; and UNITED STATES
FOREST SERVICE, an agency of the
U.S. Department of Agriculture,

                    Defendants.

Case No. 2:09-CV-164-EJL-REB

**AMENDED MEMORANDUM
ORDER**

**INTRODUCTION**

On July 2, 2010, United States Magistrate Judge Ronald E. Bush issued his Report

and Recommendation in this matter. (Dkt. 51.) Pursuant to 28 U.S.C. § 636(b)(1), the

parties had ten days in which to file written objections to the Report and Recommendation.

Defendants Jane Cottrell, Ranotta McNair and the United States Forest Service

("Defendants") filed their objections on July 19, 2010. (Dkt. 52.) Lands Council filed its

response to the objections on July 24, 2010. (Dkt. 53.) The applicable federal rules, local

rules and statutes do not provide for a reply to be filed.[1]

Pursuant to 28 U.S.C. § 636(b)(1)(C) this Court "may accept, reject, or modify, in

whole or in part, the findings and recommendations made by the magistrate judge."

Moreover, this Court "shall make a de novo determination of those portions of the report

which objection is made." *Id.* In *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th

cir. 2003) the court interpreted the requirements of 28 U.S.C. 636(b)(1)(C):

The statute [28 U.S.C. § 636(b)(1)(C)] makes it clear that the district judge must review the magistrate judge's findings and recommendations de novo if objection is made, but not otherwise. As the *Peretz* Court instructed, "to the extent de novo review is required to satisfy Article III concerns, it need not be exercised unless requested by the parties." *Peretz v. United States*, 501 U.S. 923, 939 (1991) (internal citation omitted). Neither the Constitution nor the statute requires a district judge to review, de novo, findings and recommendations that the parties themselves accept as correct. *See United States v. Ciapponi*, 77 F.3d 1247, 1251 (10th Cir. 1996) ("Absent an objection or request for review by the defendant, the district court was not required to engage in any more formal review of the plea proceeding."); *see also Peretz*, 510 U.S. at 937-39 (clarifying that de novo review not required for Article III purposes unless requested by the parties) . . . .

*See also Wang v. Masaitis*, 416 F.3d 993, 1000 & n.12 (9th Cir. 2005). Based on the

objections filed in this case, the Court has conducted a de novo review of the record

pursuant to

28 U.S.C. § 636(b).

---

[1]	Fed. R. Civ. P. 72(b)(2); Dist. Idaho Loc. Civ. R. 72.1(b); and 28 U.S.C. § 636(b)(1).

**FACTUAL AND PROCEDURAL BACKGROUND**

The Court adopts and incorporates by reference the factual background as set forth

in the Report and Recommendation on pages 2-7:

This is a civil action seeking review of a decision by the United States Forest service approving the Bussel 484 Project ("Project") in the St. Joe Ranger District of the Idaho Panhandle National Forest ("IPNF"). *Second Amended Complaint*, ¶ 2 (Docket No. 17).

**A. The Parties**

Plaintiff, the Lands Council, is a nonprofit corporation dedicated to the long-term community and biological stability of the Greater Columbia river Ecosystem. *Id.* at ¶ 15. Plaintiff's members and staff use and enjoy the IPNF, including the area in which the Project will take place. *Id.* at ¶ 10. Defendants include: (1) Jane Cottrell, Acting Regional Forester for the Northern Region of the Forest Service; (2) Ranotta K. McNair, the Forest Supervisor for the IPNF; and (3) the USFS, an administrative agency within the Department of Agriculture (collectively referred to hereinafter as "Forest Service") entrusted with management of the national forests.

**B. The Project Area**

The Bussel 484 Project Area is located within the Bussel Creek Watershed, a tributary of Marble Creek, and is located eight miles northeast of Clarkia, Idaho, Shoshone County in the IPNF. (AR 3:1). The Project Area covers 14,646 acres, 83% of which is Forest Service land. *Id.* The remaining 2,454 acres are privately owned. *Id.*

The Project Area is composed of subalpine fir, spruce, western red cedar, western hemlock, and grand fir forests located entirely within the IPNF's Old Growth Management Unit ("OGMU") Eight. *See Second Amended Complaint*, ¶ 29 (Docket No. 17); (AR 2:163). Both parties agree that the quality of old growth habitat in the Project Area has degraded over time due to fire and past logging activity. (AR 2:147-48); *See First Amended Complaint*, ¶¶ 29-34 (Docket No. 17).[2]

**C. Project Development**

From the outset, beginning in August 2003, the Forest Service involved interest groups, individuals, tribes, and agencies in the development of the Project. (AR 3:30, 2:7).[3] Early on in the process, the purpose and need for the Project were identified as follows: (1) maintain or improve resilience of the vegetative resources to disturbances such as insects, disease, and fire; (2) provide wood products for local communities; (3) work toward full

---

[2]      Plaintiff contends that the habitat has also been degraded due to fire suppression activity, but the Forest Service contests that allegation. *Defendants' Opposition to Plaintiff's Summary Judgment*, p. 7, n. 5 (Docket No. 35).

[3]      *See generally* AR 4-73 (project development) and AR 74- 180 (public involvement).

support of designated beneficial uses in the Bussel Creek Watershed; and (4) manage access to provide for multiple uses. (AR 2:4-5, AR 3:1-2).

In April 2005, the Forest Service issued a scoping notice and also published in the Federal Register a notice of intent to prepare an environmental impact statement. (AR 3:30, AR 2:7). After several years of work, study, and collaboration, a draft environmental impact statement ("DEIS"), was made available for public comment on the IPNF website on February 21, 2008. (AR 3:30, AR 144). A related Notice of Availability appeared in the Federal Register on March 7, 2008. (AR 3:30, AR 156).

The DEIS identifies three possible alternative actions in the Project Area: Alternative A: no action, Alternative B: proposed logging and related road construction activities, and Alternative C: logging with no road construction. (AR 1:3). In May 2008, the Forest Service issued a final environmental impact statement ("FEIS") (AR:2) and a Record of Decision ("ROD") (AR:3) approving Modified Alternative B, the commercial logging and road construction project -- the Bussel 484 Project.

Modified Alternative B involves the harvest of approximately 2,137 acres using a variety of silvicultural prescriptions (1,486 acres of commercial thin, 521 acres of group shelterwood, 53 acres of seedtree, and 78 acres of clearcut with reserves). (AR 3:5). The ROD indicates that Alternative B was selected, in part, because "it best meets the need to improve vegetative conditions through reducing stand density, changing species composition, and promoting larger trees in the future." (AR 3:27). By reducing stand density, the Forest Service intends to "decrease the competition for water, nutrients, and sunlight in stands and promote increased growth and yield." (AR 3:27). The goal is to remove the smaller trees and focus growth on the larger diameter, more vigorous trees. (AR 3:28).

To facilitate the harvest activities, Modified Alternative B also involves road construction. The road activity authorized by the Project includes: (1) constructing 4.5 miles of system road and .5 miles of temporary road; (2) improving or reconstructing 5.4 miles of existing road; and (3) removing 10.7 miles of existing roads and placing 20.2 miles of existing roads into "long term storage."[4] (AR 3:4).

The ROD provides that the Project will not harvest any timber or construct any roads within old growth stands. (AR 3:14, 45). However, it is undisputed that the Project will have an effect on the habitat of old growth dependent species. The FEIS states that the Project will eliminate the following habitat: (1) one of eight home ranges modeled for the pileated woodpecker (AR 2:272); (2) three of 19 nesting stands modeled for the goshawk (AR 2:275); (3) 100 acres of habitat modeled for the threatened Canada lynx (AR 2:279); (4) and 256 acres of habitat modeled for the fisher and marten (AR 2:288). Nevertheless,

---

[4]     The roads are put into "long term storage" by removing culverts and erecting barriers with no foreseeable plans to put the roads back into use for 15-20 years. (AR 3:9).

evaluating the over-all impact of the Project on wildlife habitat, the Forest Service determined that the Project would not contribute towards federal listing or loss of viability for any of the wildlife species in the Project Area. (AR 2:292).[5]

With regard to cumulative impacts, both the DEIS and FEIS identify "fire and fuels" as having an environmental effect on the Project Area. (AR 1:82-88), (AR 2:129-42). The DEIS analyzes the effect of fire under the general direction of Forest Plan. (AR 1:82). The FEIS analyzes the effect of fire under the now-withdrawn forest-wide, 2008 IPNF Fire Management Plan ("2008 Fire Plan"). (AR 129). Consistent with the 2008 Fire Plan, the logging aspect of the Project is intended to mimic the effects of fires of low to moderate intensity. (AR 2:141-42, AR 3:39-40). However, fire itself will be suppressed throughout the Project Area. (AR 2:61) ("Consistent with current policy, efforts will be made to suppress all fires which occur in the project area.").

## D. Procedural History

Plaintiff filed an administrative appeal of the decision approving Modified Alternative B, and the Forest Service denied the appeal on July 31, 2008, constituting the final administrative action in this matter. On April 9, 2009, Plaintiff filed the instant action arguing that the Project violates NFMA, NEPA, and the Administrative Procedures Act ("APA"). Plaintiff seeks injunctive and declaratory relief arguing that the Project, if implemented, will eliminate habitat for old growth dependent, sensitive, threatened, and management indicator species, including the pileated woodpecker, goshawk, Canada lynx, fisher, and marten. *Plaintiff's Memorandum in Support of Motion for Summary Judgment*, p. 2 (Docket No. 25).

Plaintiff also asserts claims related to a proposed action, the 2008 Fire Plan. On March 18, 2008, the Forest Service implemented a Fire Plan for the IPNF. (AR 1037). At one time, Plaintiff claimed that approval of the 2008 Fire Plan violated NEPA and the Endangered Species Act. *First Amended Complaint* (Docket No 11). However, when the Forest Service later withdrew the 2008 Fire Plan, Plaintiff withdrew these claims. *See* Docket No. 16. Nonetheless, Plaintiff continues to contend that the Project EIS is flawed, in part, because the analysis of the cumulative environmental impacts of fire and fire management is based on the implementation of the now-withdrawn 2008 Fire Plan. *Second Amended Complaint* (Docket No. 17).

## E. Status of Project Implementation

Two timber sales authorized as part of the Project, the Bussel Peak and Tole Booth sales, have been awarded. Plaintiff represents that logging activity in the Project area may

---

[5]    The FEIS considered the Project's impact on the following species: pileated woodpecker (AR 2:269-72), northern goshawk (AR 272-76), elk (AR 2:276-78), Canada lynx (AR 2:279-83), gray wolf (AR 2:284-86), fisher and marten (AR 2:286-88), wolverine (AR 2:288-89), black-backed woodpecker (AR 2:289-90), Coeur d'Alene salamander (AR 290-91), and western toad (AR 2:291-92).

begin as soon as August 1, 2010.[6] *See Second Declaration of Jeff Juel*, ¶ 8 (Docket No. 47-1).

## STANDARD OF REVIEW

The Court adopts and incorporates by reference the standard of review as set forth in the Report and Recommendation on pages 7-8:

The APA provides the authority for judicial review of agency decisions under NFMA and NEPA. *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006). The APA states, in relevant part, that a review court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be – arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard is deferential and an agency will be reversed as arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009) (quotations and citations omitted).

Nevertheless, the Court must review the administrative action to ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). In reviewing that explanation, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 285 (1975); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).

## OBJECTIONS

### 1. Ripeness

The Defendants' argue that Lands Council's action is not ripe for the Court's adjudication. In their objection the Defendants rely primarily on *Ohio Forestry Ass'n, Inc.*

---

[6]     In its response to the Defendants' objections Lands Council represented that the contractors in the awarded timber sales no longer intend to start on the August 1, 2010 date . (Pl.'s Mem. at 3.)

*v. Sierra Club*, 523 U.S. 726 (1998). In *Ohio Forestry* the plaintiffs challenged the adoption

of logging standards in the forest plan. *Id.* at 730. The Supreme Court held that this

challenge was not ripe because no projects based on those logging standards had yet been

contemplated, the forest plan itself did not authorize the cutting of any trees. *Id.* at 733-34.

The Defendants argue that the current case is analogous because Lands Council is

challenging Forest Plan old growth standards and the species at issue do not exclusively use

old growth stands. (Defs.' Obj. at 4.) Unlike *Ohio Forestry*, however, the present case deals

with an actual plan to cut trees. This plan necessarily implicates the Forest Plan's old

growth standards, even if Lands Council is not challenging the project on the basis that

those standards will not be met. (Report and Recommendation at 9.) The old growth

standards are at issue "because the Forest Service relied upon the old growth standards as a

proxy to ensure that it is meeting the species viability and monitoring requirements." *Id.* at

10. Therefore, given that the decisionmaker has issued its final decision, Lands Council's

action is properly before the Court.

## 2. Collateral Estoppel

Defendants argue that Lands Council's action is collaterally estopped based on

*Lands Council v. McNair*, No. 06-00425-EJL, slip op. at 26-28 (D. Idaho Sept. 30, 2009).

The Defendants argue that the exact same issues were present in that case and that they

were resolved in favor of the Forest Service. (Defs.' Obj. at 4.) The current challenge,

however, is in a different area of the forest and presents issues unique to that area. The

Ninth Circuit has held that a claim should not be collaterally estopped from proceeding

where different timber stands located in different management areas of the same forest with their own unique factual circumstances are at issue. *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002). The Court adopts the Report and Recommendation's analysis that because different project areas are involved with different characteristics, collateral estoppel does not apply. (Report and Recommendation at 12-13.)

## 3. Proxy-on Proxy

The Forest Service has elected to meet the standard for the maintenance of viable wildlife populations in the project area through a proxy-on-proxy approach. The Forest Plan requires that the Forest Service maintain Management Indicator Species ("MIS") within the area. (AR 942: II-5). This itself is a proxy, the viability of the MIS standing in for the viability of all species in the Project Area. The Forest Service reasons that these MIS are more susceptible to management activities like logging and road building than most species, and so if the impact of the activity on the MIS can be ascertained then the Forest Service will have met its burden in taking a "hard look" at the impact of its activities and satisfied its mandate to provide for the viability of all species. (AR 2: 257).

Directly monitoring the population of the MIS is more difficult than evaluating the status of the MIS' habitat. The Ninth Circuit has consistently held that a second proxy, a proxy for a proxy, may be employed to determine the impact on the MIS. *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir. 2004); *accord Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1250 (9th Cir. 2005) (holding that habitat-as-proxy is appropriate "only where both the Forest Service's

knowledge of what quality and quantity of habitat is necessary to support the species and the Forest Service's method of measuring the existing amount of that habitat are reasonably reliable and accurate."). In this case the Forest Service chose to evaluate the impact of its proposed activities in the Project Area through the habitat of the MIS in order to determine the impact that the activities would have on the MIS itself. (AR 2: 249). The Forest Service's logic is that if it can properly evaluate the impact of its proposed action on the MIS' habitat, it will be able to effectively determine the impact of the action on the MIS, which will allow it to in turn evaluate the proposed action's impact on species viability as a whole.

An exception to the general validity of the proxy-on-proxy approach is where the existence of a given MIS cannot be confirmed within the proposed project area. While a habitat proxy is allowed, it must be evaluated to determine whether "it 'reasonably insures' that the proxy results mirror reality." *Gifford Pinchot Task Force*, 378 F.3d at 1066 (quoting *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 972-73 (9th Cir. 2002). In *Native Ecosystems Council v. Tidwell*, 599 F.3d 926 (9th Cir 2010) the Ninth Circuit addressed a situation where the Forest Service attempted to use habitat as a proxy to determine the impact of its proposed action on an MIS that was absent from the project area. *Id.* at 933. The Ninth Circuit ultimately rejected the Forest Service's proposed project and held that "[t]he proxy-on-proxy approach's reliability is questionable when the MIS is absent from the project area." *Id.* at 933. What the Ninth Circuit noted was a missing link in the logical chain that would normally support the use of proxy-on-proxy. Without evidence

of the existence of MIS in the project area it becomes a black box, the Forest Service is unable to determine the impact of its proposed action on the viability of the species in that area and the MIS itself.

In their objection to the Report and Recommendation's reliance on *NEC* the Defendants argue that the Ninth Circuit's earlier en banc decision, *Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008), should control in this case. (Defs.' Obj. to Report and Recommendation at 6, Dkt. 52.) The Ninth Circuit took that case en banc in order "to clarify some of our environmental jurisprudence with respect to our review of the actions of the United States Forest Service." *McNair*, 537 F.3d at 984. In that case, the plaintiffs challenged a Forest Service action in the IPNF on the basis that its scientific analysis of the effects of its action on the MIS flammulated owl and its habitat. *Id.* at 994. The main thrust of the Ninth Circuit's decision was that when determining that a proposed action would have no impact on a given species "the Forest Service must support its conclusions that a project meets the requirements of the NFMA and the relevant Forest Plan with studies that the agency, in its expertise, deems reliable." *Id.* It is therefore not for the district court to evaluate the reliability of the evidence which the Forest Service deems credible. The plaintiffs in *McNair* simply challenged whether the Forest Service's use of the proxy-on-proxy approach was reliable. *Id.* The *McNair* court rejected this challenge and relied on the Forest Service's assertion that the population of flammulated owls would not decrease and may be improved in the long term. *Id.* at 997. The Ninth Circuit noted, however, that prior instances where proxy-on-proxy had been rejected were valid because they "reasonably

limited the Forest Service when, based on the particular facts before the court, the use of habitat as proxy was arbitrary and capricious." *Id.* at 998

The Ninth Circuit's holding in *NEC* does not conflict with the en banc decision in *McNair*. *NEC* merely identified a situation where the normally valid proxy-on-proxy approach of measuring species viability would be arbitrary and capricious. The *NEC* outcome is perfectly consonant with the directive from *McNair* for the courts to defer to the Forest Service's science. Ultimately all that *NEC* recognizes is that the Forest Service's science speaks only for the propositions that it contains. The Ninth Circuit in *NEC* had no argument with the Forest Service's science which showed that the proposed action would not negatively impact the MIS, it noted that "there is simply no basis to evaluate the Forest Service's assertion that the sagebrush habitat is sufficient to sustain viable sage grouse populations when sage grouse cannot be found in the project area." *NEC*, 599 F.3d at 933. In other words, the Forest Service could show conclusively that sage grouse preferred a certain kind of habitat; but if this habitat was maintained and no sage grouse could be found, it could not logically rely on knowledge about what habitat sage grouse preferred to say that maintenance of that habitat *guaranteed* a viable population of sage grouse. The Ninth Circuit, then, only recognized an exception to the general rule that proxy-on-proxy is a permissible way to assess the impact of a proposed action on an MIS population. In order to qualify for this exception the MIS population must: (1) have trended downward in the area *Id.* at 930 and (2) be virtually non-existent in the project area. *Id.* at 933. Even if these

two standards are met, the Forest Service might still be able to use proxy-on-proxy if it can demonstrate difficulties in monitoring the MIS. *Id.* at FN 9.

Because the Court has found that *NEC* is the controlling standard in the case, it must determine whether the factual elements in the administrative record are sufficient to show the population trend of the MIS and whether the particular MIS at issue are present in the project area. Depending on these factual findings the Court may then consider whether there are sufficient monitoring difficulties to warrant an exception to the *NEC* standard.

**(A) Population Trends**

The purpose of assessing population trends is to determine whether habitat-as-proxy is actually successful at tracking the viability of a given species population. *NEC*, 599 at 935 ("In applying the proxy-on-proxy approach to evaluate whether the project complied with the Forest Service's duty to ensure wildlife diversity, the Forest Service did not adequately consider evidence that, despite the Forest Service's asserted compliance with the *Connelly Guidelines*, the sage grouse population continued to trend downward"). If the Forest Service can demonstrate, using the administrative record, that its reliance on habitat-as-proxy in its management decisions generated outcomes consistent with its expectation that maintaining habitat at certain levels would produce stable or increasing population trends, its burden to establish that the MIS was present in the project area will be lighter. The three MIS that were at issue in the Report and Recommendation are the northern goshawk, the pileated woodpecker, and the marten. (AR 3:55) (Elk are also included but their population trend is not disputed).

*(1) Northern Goshawk*

In order to show that the northern goshawk population is on an upward trend the Defendants point towards the Final Environment Impact Statement (FEIS). In turn, the study that the FEIS cites for its conclusion that the short-term viability of the northern goshawk is not at issue is Samson 2006. (AR 2:275) Samson 2006 is also cited by a letter outlining regional direction to foresters on how to evaluate northern goshawk habitat, a letter which the Defendants cite for the same proposition as the FEIS. (AR 494:1) However, Samson simply cannot be read to support any conclusions about population trends. Samson 2006 is similar to the *Connolly Guidelines* in *NEC*. It is a review of the best available literature on the availability of habitat, and from this literature gives foresters the tools to evaluate whether such habitat is present in the forest for the purposes of estimating population trends. (AR 901:5). In this sense, Samson is predictive only. It is true that Samson concludes that "[n]o scientific evidence exists that the northern goshawk is decreasing in numbers." *Id.* at 39. However, Samson 2006 is unable to show that northern goshawk populations are actually increasing and can conclude only that "[s]uppression of natural ecological processes has increased and continues to increase amounts of northern goshawk habitat." *Id.* at 40. While Samson 2006 appears to be the best available science for the estimation of habitat availability, in light of the Ninth Circuit's decision in *NEC*, this evidence cannot satisfy the Forest Service's burden to show that population trends are actually increasing.

The Forest Service does indicate that the northern goshawk had, at the time of the final decision, been removed from the sensitive species list. (AR 2:275; AR 494:2). While this would certainly seem to indicate a positive trend in population growth it is not reflected in the Forest Service's other analyses. In the 2003 IPNF Plan Monitoring and Evaluation Report, the northern goshawk's population trend is listed as "unknown." (AR 976:38).[7] While the Court recognizes that there is some indication that the northern goshawk's population has increased, the evidence is not sufficient to indicate that monitoring habitat-as-proxy is so certain that the Forest Service's burden to show that the northern goshawk is actually present in the Project Area can be waived.

### (2) Pileated Woodpecker

The Defendants make the same citations for the pileated woodpecker as they do for the northern goshawk. The FEIS concludes that there is no evidence that the pileated woodpecker is decreasing in numbers, citing to Samson 2006. (AR 2:272). The Court has already discussed the limitations of the Samson 2006 study, which are just as applicable to the pileated woodpecker as to the northern goshawk. The 2003 report also notes that the population trend for the pileated woodpecker is "unknown". (AR 976:38). In addition, there are no population estimates for 1998 or 2003. *Id.* The Forest Service cannot support its decision to rely on proxy-on-proxy in the Project Area with a growing population trend for

---

[7]    The Court notes that while the Report and Recommendation indicated that the last wildlife survey had been performed in 1993 it cited to the 2003 report for the same species. (Report and Recommendation at 30-31.) Defendants have noted that the report is updated in five year cycles with the next report (2008-2009) still pending. (Defs.'s Obj. at FN 4.) Therefore, the 2003 report is what would have been available to the decisionmaker at the time of the final decision.

pileated woodpecker as a result of habitat management because it has presented no

evidence that the pileated woodpecker population is increasing.

### (3) Marten

Defendants cite to Ruggiero 1994 and Coffin et al 2002 to demonstrate that marten

populations are increasing. Neither study, however, purports to document marten

populations or even the extent of their habitat in the IPNF. Ruggiero 1994 is a general

overview of the marten, its habitat and its research needs. (AR 896:7). Coffin et al 2002 is a

study of the marten's natural range. (AR 565). Like the northern goshawk and the pileated

woodpecker, the 2003 report notes that the population trend of the marten is "unknown".

(AR 976:38). There is also no population estimate for 1998 or 2003. (AR 976:38). The

Forest Service likewise cannot support its decision to use proxy-on-proxy with the evidence

it has presented relating to the marten's population trends.

## (B) Species Presence

As a threshold matter Defendants contend that they are not required to determine the

presence of the MIS, or indeed evaluate the viability of a species, within a given project

area because the IPNF Forest Plan mandates that they "[m]aintain at least minimum viable

populations of management indicator species distributed throughout the forest." (AR

942:II-28). Similar language appeared in the Forest Plan at issue in *NEC*. There the Forest

Service instructed that "[v]iable populations of all existing wildlife species will be

maintained by providing a diversity of habitats throughout the Forest." *NEC*, 599 F.3d at

932. Despite the same "throughout the forest" language, the Ninth Circuit nonetheless held

that the Forest Service's duty to provide for viable populations required it to determine that an MIS was present in the given project area before it could use proxy-on-proxy. *Id.* at 933. It is difficult to imagine how the Forest Service could satisfy its burden under the NFMA if it was excused from all site specific analyses of a proposed project's impact, and no known court has ever held that the Forest Service is excused from assessing the impact of a proposed project on a project area.

The Court is cognizant of the fact that the Project Area is just one part of the much larger IPNF, and that its borders are drawn to suit human needs as opposed to a naturally occurring boundary that is a perfect snapshot of the forest as a whole. The Project Area cannot be viewed in complete isolation, nor can its uniqueness serve to completely sever it from the dynamic of the larger forest. Given the imperfect measuring methods available to the Forest Service and the indifference of wildlife to the need to be counted, the Court has struggled with the concept of "presence" as it is defined in *NEC*. That said, however, the *NEC* decision is not as rigid as the Defendants claim. The dissent's criticism that reduces the analysis area to the ranger's backyard is answered by the majority which holds that the Forest Service "must indeed analyze *that particular site* to determine the effects of the proposed action." *Id*. at 934 (emphasis in original). This does not say that there must be a certain number of species or certain signs in every area, simply that the Forest Service cannot divest itself of its duty to assess the impacts of its proposed actions by reducing the scale of the proposed project site. "Presence" for the purposes of an *NEC* analysis should be flexible enough not to unduly burden the Forest Service, but should be substantial enough

to provide a reasonable basis for the assertion that the impact on the actual habitat in the proposed project area reflects the impact of the proposed action on the MIS.

The Court also notes that in its reading of the limited holding of *NEC* that the Forest Service's burden to establish the presence of MIS in the Project Area may be mitigated if the Forest Service can demonstrate that its proxy-on-proxy method is viable. As noted above, evidence that habitat management throughout the forest has produced population trends consistent with what the Forest Service had hoped to achieve through its management decisions would indicate that the necessity of finding MIS in the specific project area is not great. However, if the Forest Service cannot demonstrate that its habitat management practices produce any known effect on species population, its burden to show that the MIS are in the Project Area in sufficient numbers to render habitat-as-proxy analysis meaningful is greater. In the present case the Forest Service is unable to demonstrate that it has any knowledge about the population trends of the MIS. In the 1993 monitoring report the population trends were unknown. (AR 949:33). Ten years later in 2003 the population trends were still unknown. (AR 976:38).[8] It is possible that evidence of forest wide population trends exist that would bolster the Forest Service's claim, or that the 2008-2009 data now shows population tends stable or increasing. However, this evidence is not in the administrative record. The Court emphasizes that the holding in *NEC* is a limited one, and if the Forest Service could provide evidence that validated its use of habitat-as-

---

[8]     The Court has attempted to locate the 1998 monitoring report in the administrative record. However, the citation provided, AR 963, leads only to four pages that includes a project file reference sheet for the 164 page document, a title sheet, and two pages discussing fish habitat.

proxy with actual results in MIS population trends it would go towards satisfying the Forest

Service's burden under the Forest Plan and NFMA.

In *NEC,* the Ninth Circuit rejected a proposed action where the only evidence of

actual MIS presence in the project area was a pair of sage grouse taken illegally from the

site. *Id.* at 934. The Ninth Circuit was also not persuaded that a sage grouse lek eleven

miles west of the project area could provide constructive presence within the project area

itself. *Id.* at 930. Though the Ninth Circuit has not articulated a firm test for what

constitutes "presence", the Court will use these benchmarks to evaluate the evidence

offered by the Forest Service to prove that the MIS are within the Project Area.

### *(1) Northern Goshawk*

In order to prove that northern goshawks are present in the Project Area the Forest

Service points to the FEIS, which states that "goshawks are occasionally sighted within the

wildlife analysis area." (AR 2:274).[9] The FEIS identifies two surveys as the basis for this

conclusion. The first is a survey conducted by Jeremy Waite in July of 2002. (AR 482).

During that month, Waite made twelve attempts to locate the northern goshawk. On July

15, 2002 Waite got a response on his bird call but "was unable to positively identify the

bird due to the suns [sic] glare." (AR 482:1). All other attempts to locate the northern

goshawk were unsuccessful, and the one possible sighting occurred three miles from the

Project Area. The second sighting is from a survey conducted in 2008 by Forester Ware.

---

[9]     The analysis area is not quite the same as the project area. A map of the analysis area is included in the
FEIS (AR 2) at 243.

(AR 504). The location of this sighting is not clear to the Court. When discussing the northern goshawk, the Defendants assert that Forester Ware's sighting was within the analysis area. (Defs.'s Obj. at 10.) When discussing the exact same survey of the exact same stand under the same numbered point the Defendants represent that a pileated woodpecker sighting was within the old growth analysis area, which is just outside the Project Area. *Id.* This discrepancy may be resolved by recognizing that the analysis area is not the same as the project area. (FEIS at 243). Despite this discrepancy the Court will accept the representations of the Defendants who are closer to the evidence than the Court, and give the sightings the weight that the Defendants suggest they should be given. In Forester Ware's survey two northern goshawks were sighted, though the forester specifically scratched out the word 'nest' and wrote in a substitute. (AR 504). The evidence of northern goshawk presence in the Project Area is analogous to the presence of sage grouse in *NEC*. A pair of northern goshawks are similar to a pair of sage grouse taken illegally from the project are and are not sufficient, lacking information about population trends, to conclude that the northern goshawk exists in the Project Area.

The Defendants point out that the northern goshawk has a large range for the proposition that northern goshawk sightings near the Project Area can be deemed to be within the Project Area itself. (Defs.' Obj. at 10.) The Ninth Circuit rejected this very same argument in *NEC*. In that case, a lek eleven miles away from the project area, even given the wide ranging nature of the sage grouse, was not sufficient to establish that the MIS was present in the project area. *NEC*, 599 F.3d at 930. Given the scant evidence in the record the

Forest Service has failed to show that northern goshawks are present in the Project Area such that the evaluation of the impact of their proposed action on northern goshawk habitat would satisfy the Forest Service's burden under the Forest Plan and the NFMA to ensure the viability of existing species.

### (2) Pileated Woodpecker

The Defendants indicate that the FEIS concluded that the pileated woodpecker was present in the project area. (AR 2:269). The evidence for this presence is contained in two surveys conducted by the Forest Service. The first is the same 2008 survey conducted by Forester Ware that also sighted a pair of northern goshawks. (AR 504). In that survey, Forester Ware sighted a single pileated woodpecker in a stand of trees just outside the Project Area. The second survey was conducted in September of 2006. (AR 462). The forester in that survey identified a number of stands, and eleven of twenty eight of them had pileated woodpecker feeding signs. (Defs. Obj. at 10.) There is no indication in the record as to where these stands are, or how old the feeding signs were. The survey indicates that some signs are old, and some are not.[10] The Court recognizes that it is not an appropriate function for the district court to inquire into the reliability of scientific evidence that the Forest Service relied upon. *Lands Council v. McNair*, 537 F.3d 981, 984 (9th Cir. 2008). The Court takes all of the representations in the survey to be true. However, the Court must also note that the purpose of the survey was to "assess the adequacy of using latest stand exam and TSMRS/FSVeg data to reasonably reflect habitat conditions." (AR 462:1). The

---

[10]         Compare stand 48403061 and 48401092, for example. (AR 462).

survey was never meant to assess the presence of wildlife in the Project Area. The Forest

Service is certainly entitled to rely on any sightings that the survey might turn up, but

eleven feeding signs out of twenty eight stands surveyed does not establish that the pileated

woodpecker is present in the Project Area for an *NEC* analysis. The Court is given no

information about the location or distribution of the stands in question, or whether the

"eleven of twenty eight" number should have some special statistical significance or even

relevance.

The Defendants have not carried their burden of demonstrating that the pileated

woodpecker is present in the Project Area. Eleven feeding signs of unknown age and the

sighting of a single bird rise to the same level of evidence as two actual sage grouse

removed from the project area in *NEC*. This is confirmed by the 1993 and 2003 IPNF Plan

Monitoring and Evaluation Reports. In 1993 the pileated woodpecker's population status

was unknown and the Forest Service was implementing new methods to survey them. (AR

949:33). Ten years later, in 2003, the population estimate of pileated woodpeckers was

unknown. (AR 976:38). Because the Forest Service cannot establish that pileated

woodpeckers are present in the Project Area, it was arbitrary and capricious to rely on a

habitat-as-proxy approach to determine the potential impact on the Project Area of its

proposed action.

### (3) Marten

The Defendants reiterate the "constructive" presence argument that they raised to argue that the population of marten was not declining; that because marten are wide ranging animals and have been spotted within six miles of the analysis area they can be deemed to be present in the Project Area. (Defs.' Obj. at 10.) The Ninth Circuit in *NEC* rejected this argument when it did not allow evidence of a lek within eleven miles of the project area to establish the presence of the sage grouse. *NEC*, 599 F.3d at 930. Because the Forest Service cannot demonstrate that it has any knowledge of the population trend of the marten, it cannot rely on sightings outside the Project Area to establish that the decision to use habitat-as-proxy was not arbitrary and capricious.

The Defendants have failed to demonstrate, based on the evidence in the administrative record, that any of the relevant MIS were present in the Project Area at the time that the decisionmaker made their final decision. The lack of species sightings otherwise ignored and unexplained by the Forest Service undermines the assumption that by taking care of the habitat the IPNF can ensure species viability.

## (C) Monitoring Difficulties

Once the Court has determined that the population trends for the MIS are unknown and that they are not present within the project area, it must assess whether monitoring difficulties exist that would justify the use of proxy-on-proxy as the best possible way to assess the impact of the proposed action. The Defendants cite Samson 2006 and other studies for the proposition that monitoring populations directly is difficult and time

consuming. (Defs.' Obj. at 14.)[11] The Court has no doubt that monitoring populations of

MIS is not easy. The Ninth Circuit, however, did not define the level of difficulty which

would provide an exception to the general rule announced in *NEC*. The Court recognizes

that the rule in *NEC* would itself become the exception if the Defendants could argue that

the difficulties inherent in the monitoring of most vertebrate species were enough to excuse

them from showing that the MIS are present in the Project Area.

The limited nature of the Court's finding should be emphasized. The Court is not

requiring, and *NEC* did not mandate, that the Forest Service maintain detailed population

trends of MIS. Rather, *McNair* requires some population evidence sufficient to confirm that

habitat-as-proxy results in the viability of MIS. All that *NEC* stands for, and all that the

Court requires now, is that if the Forest Service chooses to rely on a proxy-on-proxy to

satisfy its burden under the Forest Plan and NFMA, it must be able to demonstrate the

presence of MIS within the project area. The Forest Service cannot evaluate the impact of

its proposed action on the MIS' habitat when there is no evidence that the maintenance of

that habitat in turn ensures a viable population of MIS as required by the Forest Plan. There

is no evidence in the record that monitoring difficulties would preclude this limited finding.

Indeed, in the 1993 IPNF Plan Monitoring and Evaluation Report the Forest Service laid

out the plans that it would follow to assess the population of the MIS and did not at that

---

[11]        The Court notes that in its reply brief Lands Council cites to extra-record evidence and Tenth Circuit
precedent for the proposition that direct monitoring of populations is not difficult. (Pl.'s Mem. at 9.) This evidence is
not timely entered and prejudice the Defendants if the Court considered it without a chance for argument. Also, the
Tenth Circuit precedent, while well taken, does not reflect the state of the law in the Ninth Circuit embodied in
*McNair* which controls this case.

**AMENDED MEMORANDUM  ORDER - 23**

time believe monitoring to be too difficult. (AR 949:33). Whether these efforts were too difficult is not for the Court to decide. However, if the Forest Service wishes to use proxy-on-proxy it must have the evidence to show that the method is valid for the proposed Project. Absent a showing of monitoring difficulties above those difficulties which are inherent in the monitoring of species in general, the Defendants should not qualify for the exception to the rule announced in *NEC*.

**(D) Other Methods**

Defendants object to the Report and Recommendation's conclusion that they relied solely on habitat-as-proxy in making their decision. (Defs.' Obj. at 11.) Defendants argue that the Forest Service did not rely solely on old growth standards, and that this means that the Forest Service "did not rely only on the habitat as proxy approach in reaching its conclusions regarding population viability." *Id.* at 12. However, an examination of the methods that the Forest Service claims that it did use, show exactly that. For the pileated woodpecker the Forest Service used Samson 2006's conclusion that "there was an abundance of well-distributed pileated woodpecker nest site habitat […] and habitat modeling to identify potentially suitable pileated woodpecker habitat and assess potential effects on the species." *Id.* at 11. For the northern goshawk the Forest Service "relied on the maintenance of suitable habitat and home ranges in the analysis area." *Id.* For the marten the Forest Service relied on "the percent of the area in mature/old forest structure (i.e. suitable habitat) in comparison with the management guidelines." *Id.* at 12. All of these approaches are habitat-as-proxy. The essence of habitat-as-proxy is that the Forest Service

measures the effect of its actions on the MIS' habitat and uses that as a conclusion about the impact on the MIS itself. All of the methods raised in the Defendants' objection follow the same logic, and none are valid unless the MIS can be shown to be present within the Project Area.

Complete absence of old growth MIS in the Project Area renders implausible the assumption that the habitat-as-proxy approach satisfies the Forest Service's monitoring and viability requirements set forth in the Forest Plan. Stated another way, if the MIS is not present then the assumption that measuring habitat alone is insufficient to prove that providing MIS habitat actually results in maintaining MIS viability. For this reason the Court adopts the conclusion of the Report and Recommendation that the Forest Service acted arbitrarily and capriciously when it relied on the proxy-on-proxy method of assessing species viability to assess the impact of the proposed action on the Project Area. Because the Forest Service acted arbitrarily and capriciously, it is in violation of the Forest Plan and the NFMA.

**4. NEPA**

The Court recognizes that "NEPA was passed by Congress to protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) (*Lands Council I*). In addition, NEPA is a procedural statute and does not mandate any particular substantive results. *Robertson v. Methow Valley Citizens*

*Council*, 490 U.S. 332, 350 (1989). The Report and Recommendation found that the EIS violated NEPA because it contained an incomplete analysis of the project's impact on the viability of MIS. (Report and Recommendation at 39.) Defendants object to this finding by arguing that there is no logical link in the Report and Recommendation between a substantive violation of the NFMA and a violation of NEPA. (Defs.' Obj. at 16.)

In order to comply with NEPA's requirement that the Forest Service be required to take a "hard look" at the proposed project's effects it "may not rely on incorrect assumptions or data in an EIS." *Native Ecosystems Council v. USFS*, 418 F.3d 953, 964 (9th Cir. 2005) (citing 40 C.F.R. 1500.1(b)). Where, as here, the alleged violation of the NFMA pertains to the procedural requirements that the Forest Service must comply with in order to ensure the viability of species, a NEPA violation can be found based on a violation of the NFMA. *National Ecosystems Council v. Tidwell*, 599 F.3d 926, 937 (9th Cir. 2010) ("Just as the methodology applied by the Forest Service to measure habitat conditions did not meet the NFMA requirements, its flawed methodology in the complete absence of a sage grouse population does not constitute the requisite 'hard look' mandated by NEPA.") (citing *NEC*, 418 F.3d at 964-65). The Forest Service failed to properly assess the impact of its proposed project on the viability of MIS in the project area, as mandated by the Forest Plan and the NFMA. As such, the EIS failed to "'inform […] decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts' on [management species]." *NEC*, 418 F.3d at 965 (citing *Klamath-Siskiyou Wildlands Ctr. v.*

*Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004)). Therefore, the violation of the NFMA serves to establish a violation of NEPA.

**5. Fire Plan**

The Report and Recommendation found that the when the Forest Service withdrew the present fire plan in favor of the 2008 Fire Plan this shift constituted a "significant new circumstance" which mandated a supplementary EIS to assess the impact of the shift. (Report and Recommendation at 42.) Defendants object to this finding on the grounds that the shift did not result in any on the ground changes that would rise to the level of a significant new circumstance. (Defs.' Obj. at 18.) Specifically, Defendants argue that because both fire plans complied with the Forest Plan and other management guidance documents, there is no need to evaluate the impact of a new plan. *Id.* The Report and Recommendation recognized, however, that within "the Forest Plan's general fire standards, there is room for the Forest Service to manage fire in different ways with different priorities and environmental impacts." (Report and Recommendation at 42.)

Defendants cite to *Swanson v. USFS*, 87 F.3d 339 (9th Cir. 1996), to support their argument. In *Swanson* the plaintiff argued that a change in the chinook salmon's listing to a threatened species constituted a significant new circumstance that mandated a supplemental EIS. *Id.* at 344. *Swanson*, however, only dealt with a change in legal status and not a change in management plans and the Forest Service had already been required to determine whether the change in status required a change in management. *Id.* Therefore, *Swanson* is distinguishable and does not control the present case. The Court adopts the Report and

Recommendation's analysis regarding the fire plan. The Court also adopts the Report and Recommendation's remedy, that "to the extent the Forest Service decides to move forward with this Project, any future analysis of the Project's environmental impact must address the cumulative impact of fire and fire management under whatever policy is in place at the time the environmental impact statement is drafted." (Report and Recommendation at 42.)

**6. Injunctive Relief**

The Supreme Court has established the standard for permanent injunction:

[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). In its most recent case discussing the standard for permanent injunction in an environmental case the Supreme Court held that such an injunction is not the automatic remedy in cases where NEPA has been violated. *Monsanto v. Geertson Seed Farms*, 130 S.Ct. 2743, 2756-57 (2010). Rather, the traditional four factor test must be evaluated to determine whether a permanent injunction is an appropriate remedy given the circumstances of the case. *Id.* Defendants object to the Report and Recommendation's conclusion that, based on these factors, the Forest Service's decision authorizing the project should be set aside and a permanent injunction issued prohibiting all current and future activity under the time sales. (Report and Recommendation at 46.) The Court will asses these factors together in order to determine

whether a permanent injunction is an appropriate remedy given the Court's finding that the Project violated both the NFMA and NEPA.

The nature of the injury which Lands Council claims will be suffered are environmental harms. By their very nature, environmental harms "can seldom be adequately remedied by money damages and [are] often permanent or at least of long duration, i.e., irreparable." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007) (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987)). The Report and Recommendation found that "it is undisputed that the Project will have a negative impact on the MIS species, and there is no indication that they are otherwise doing well in the Project Area." (Report and Recommendation at 45). The Court is not convinced that the harms are undisputed, but because the Forest Service cannot demonstrate what the impact of its proposed action will be on the viability of species in the project area, the Court will adopt the Report and Recommendation's findings that the harms that Lands Council alleges are irreparable in nature. *Id.* To hold otherwise would be to reward the Forest Service for failing to perform its statutory duty in assessing the impact of its proposed actions on the viability of species. Whatever damage to species viability would be done by the Project cannot be undone, nor any effective remedy provided once the action has taken place. Certainly monetary relief is insufficient to remedy loss of species viability.

When determining whether a permanent injunction should issue the Court must weigh potential environment injury against other harms that will result from that injunction. *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008). The Defendants claim that if

the Project is enjoined, the local community will suffer economic hardships and significant management risks like fire danger, insect infestation, drought and disease will go unaddressed. (Defs.' Obj. at 19.) The Court recognizes that these are serious harms. The Court is particularly concerned that the state of the Project Area might continue to deteriorate if management actions are not taken. An injunction might frustrate the ultimate goal of species preservation if the Forest Service is prevented from implementing the Project. However, it would defeat the purpose of NEPA and the NFMA if the Forest Service could fail to adequately assess the impact of its proposed project on a project area and then claim that its actions would be necessary and beneficial to the health of the project area in order to defeat an injunction.

It is for this reason that the Court adopts the Report and Recommendation's position that the agency's decision should be vacated and a permanent injunction on all pending and awarded timber sales be issued. The Court does not foreclose the possibility that the very real economic harms suffered by local communities as a result of environmental litigation might overwhelm even a valid claim that the Forest Service did not follow procedures mandated by NEPA and the NFMA. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.") In this case, however, failure to provide for an injunction would undermine the public's interest in ensuring that executive agencies follow the laws that govern their conduct. The

NEPA and NFMA violations that the Court has found here are not mere technical deficiencies or oversights, they are failures of procedure that go to the heart of the Forest Service's mission to ensure the viability of species within the national forests.

For these reasons the Court finds that the Lands Council has satisfied its burden to show irreparable harm as a result of the proposed project. In addition these harms are not readily remedied by the tools available at law as they cannot be compensated by money. An equitable remedy is appropriate in this case due to the lack of remedy at law, and because the balance of harms when the public interest is properly considered against the harms alleged by Lands Council indicate that an injunction should be issued.

## CONCLUSION

Lands Council's claim is ripe because it concerns old growth standards in the context of species viability and because the decisionmaker has issued its final decision. Lands Council's claims are not precluded because these claims concern a different project area than the one at issue in *Lands Council v. McNair*, No. 06-00425-EJL, slip op. (D. Idaho Sept. 30, 2009). Because it is undisputed the Project will have a negative impact on the habitats of the pileated woodpecker, northern goshawk and marten, the lack of evidence that the other available habitats will protect MIS populations and keep them from decreasing is unknown. The Forest Service's decision to authorize the Project was arbitrary and capricious because its use of habitat-as-proxy to assess the impact of the Project on the viability of MIS populations was flawed. In the absence of evidence about MIS population trends and where no MIS can be located within the Project Area the Forest Service's

reliance on habitat-as-proxy was arbitrary and capricious. Because of this finding the Forest Service's decision to authorize the Project is set aside and remanded to the agency. Whatever fire plan is in effect at the time of any new supplemental EIS must be evaluated in that EIS. A permanent injunction on all pending and approved timber sales for the Project Area is appropriate given the irreparable harm shown by Lands Council and is in the public interest.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1) The Report and Recommendation entered on July 02, 2010 (Dkt. No. 51) be **INCORPORATED** and **ADOPTED** in its entirety.

2) Plaintiff's Motion for Summary Judgment (Dkt. No. 24) be **GRANTED**.

3) Defendants' Motion for Summary Judgment (Dkt. No. 27) be **DENIED**.

4) Plaintiff's Motion for Preliminary Injunction is **DENIED AS MOOT.**

5) Counsel for Plaintiff is directed to provided the Court with a proposed Judgment consistent with this Amended Memorandum Order within five (5) days from this date.

DATED: **August 9, 2010**

Honorable Edward J. Lodge
U. S. District Judge